CRACE et al., Appellants,

v.

KENT STATE UNIVERSITY, Appellee.

[Cite as *Crace v. Kent State Univ.*, 185 Ohio App.3d 534, 2009-Ohio-6898.]

Court of Appeals of Ohio,
Tenth District, Franklin County.

No. 08AP–1080.

Decided Dec. 29, 2009.

536

Anthony J. Cespedes and Stanley R. Rubin, for appellants.

Roetzel & Andress, L.P.A., Ronald B. Lee, and Moira H. Pietrowski; and Richard Cordray, Attorney General, and Anne Strait, Principal Assistant Attorney General, for appellee.

---

CONNOR, Judge.

{¶ 1} Appellants, Angela, Robert, and Rhonda Crace, appeal the decision of the Ohio Court of Claims granting judgment to appellee, Kent State University ("KSU"), after a bench trial on the bifurcated issue of KSU's liability. The trial court granted judgment to KSU after finding that the defense of primary assumption of the risk barred appellants' negligence and loss-of-consortium claims. For the reasons that follow, we affirm the decision of the trial court.

{¶ 2} On February 12, 2001, Angela was a junior at KSU and was a member and captain of KSU's varsity cheerleading team. During the team's practice on that date, the KSU coach, Lenee Buchman, assigned participants to positions in a maneuver known as the Big K.

{¶ 3} The Big K was essentially a human pyramid that consisted of a base, a middle layer/base, and flyers. Additionally, spotters were positioned on the ground to catch the flyers when they came down. The pyramid was two and one-half people high and had the highest degree of difficulty permitted by the NCAA.

{¶ 4} Angela and several other members of the KSU team had performed the Big K successfully in the previous season. However, several other members of the KSU team had not performed nor even seen the Big K before the team attempted it on February 12, 2001. Indeed, KSU's team included cheerleaders with varying levels of experience and expertise.

{¶ 5} On February 12, 2001, Buchman assigned Angela to the position of a flyer. The first two attempts at the mount failed, which resulted in Angela falling from around 15 feet in the air. After each of these two failed attempts, Angela's front spotter caught her when she fell. Before the third attempt, Buchman substituted Detrick Cobbin as Angela's rear spotter. Cobbin had neither seen nor participated in the Big K prior to February 12, 2001.

{¶ 6} According to Cobbin, before the third attempt, he told Buchman that he was uncomfortable performing as a spotter in the Big K. According to Buchman, this statement never occurred.[1]

{¶ 7} It is undisputed, however, that Cobbin participated in the third attempt, which again failed. As a result, Angela again fell from around 15 feet in the air. When she came down, Cobbin failed to catch her. Instead, he panicked, shielded

---

1. The trial court never reached a factual finding regarding this specific issue.

his eyes, and moved out of the way. As a result, Angela's fall was unbroken and caused catastrophic injuries, including immediate paraplegia.

{¶ 8} Accordingly, appellants filed this suit against KSU alleging claims of negligence and loss of consortium based upon Buchman's conduct. The bifurcated issue of KSU's liability proceeded to a bench trial on July 24, 2006. On November 12, 2008, the trial court issued a decision granting judgment to KSU. Appellants timely appealed and raise the following assignments of error:

1. The trial court erred in granting judgment to the appellee as a matter of law with regard to [the] application of the doctrine of primary assumption of [the] risk.

2. The trial court erred in granting judgment to the appellee with regard to its application of the standard of reckless or intentional conduct being necessary with regard to this cause of action.

3. The trial court's decision was contrary [to] and in disregard of the manifest weight of the evidence[,] and [the trial court] erred in granting judgment for the appellee, by [determining] that the appellant failed to prove negligence and/or reckless conduct, by the appellee's agent.

{¶ 9} We will initially address appellants' first and second assignments of error, which relate to the trial court's application of the primary-assumption-of-the-risk defense to the circumstances of this matter. The issues therefore regard whether Angela assumed the risk of injury by participating in varsity cheerleading at KSU.

{¶ 10} It is well settled that Ohio law recognizes three separate types of the defense of assumption of the risk: express, primary, and implied. *Ballinger v. Leaniz Roofing, Ltd.*, 10th Dist. No. 07AP–696, 2008-Ohio-1421, 2008 WL 802722, ¶ 6, citing *Gentry v. Craycraft*, 101 Ohio St.3d 141, 2004-Ohio-379, 802 N.E.2d 1116, ¶ 11; see also *Gallagher v. Cleveland Browns Football Co.* (1996), 74 Ohio St.3d 427, 431, 659 N.E.2d 1232.

{¶ 11} Express assumption of the risk applies when parties expressly agree to release liability. *Ballinger* at ¶ 7; see also *Zigler v. Avco Corp.*, 165 Ohio App.3d 319, 2005-Ohio-6130, 846 N.E.2d 547, ¶ 18, citing Prosser & Keeton, The Law of Torts (5th Ed.1984), 496, Section 68. Although Angela and her parents signed an informed-consent form before each KSU cheerleading season, these forms did not contain any exculpatory language releasing KSU from liability. Indeed, KSU makes no legitimate argument to the contrary. As a result, express assumption of the risk does not apply to the instant matter. Instead, the issue is whether the trial court erred by applying primary assumption of the risk.

{¶ 12} Ohio courts routinely apply primary assumption of the risk to cases involving sporting events and recreational activities. Id. at ¶ 8, citing *Anderson v. Ceccardi* (1983), 6 Ohio St.3d 110, 114, 6 OBR 170, 451 N.E.2d 780. The applicability of the primary-assumption-of-the-risk defense presents an issue of law for the court to decide. *Gallagher* at 435, 659 N.E.2d 1232. We therefore review the trial court's decision to apply the defense de novo. *Cleveland Elec. Illum. Co. v. Pub. Util. Comm.* (1996), 76 Ohio St.3d 521, 523, 668 N.E.2d 889, citing *Indus. Energy Consumers of Ohio Power Co. v. Pub. Util. Comm.* (1994), 68 Ohio St.3d 559, 563, 629 N.E.2d 423.

{¶ 13} Under primary assumption of the risk, a person assumes the inherent risks of the recreational activity and cannot recover for injuries unless another person acted recklessly or intentionally. *Santho v. Boy Scouts of Am.*, 168 Ohio App.3d 27, 2006-Ohio-3656, 857 N.E.2d 1255, ¶ 12; see also *Marchetti v. Kalish* (1990), 53 Ohio St.3d 95, 559 N.E.2d 699, syllabus. The rationale is that certain risks are so inherent in some activities that the risk of injury is unavoidable. *Collier v. Northland Swim Club* (1987), 35 Ohio App.3d 35, 37, 518 N.E.2d 1226; see also *Aber v. Zurz*, 175 Ohio App.3d 385, 2008-Ohio-778, 887 N.E.2d 381, ¶ 10, quoting *Lykins v. Fun Spot Trampolines*, 172 Ohio App.3d 226, 2007-Ohio-1800, 874 N.E.2d 811, ¶ 34.

{¶ 14} The Supreme Court of Ohio has further described the underlying rationale. See *Thompson v. McNeill* (1990), 53 Ohio St.3d 102, 559 N.E.2d 705:

Acts that would give rise to tort liability for negligence on a city street or in a backyard are not negligent in the context of a game where such an act is foreseeable and within the rules. For instance, a golfer who hits practice balls in his backyard and inadvertently hits a neighbor who is gardening or mowing the lawn next door must be held to a different standard than a golfer whose drive hits another golfer on a golf course. A principal difference is the golfer's duty to the one he hit. The neighbor, unlike the other golfer or spectator on the course, has not agreed to participate or watch and cannot be expected to foresee or accept the attendant risk of injury. Conversely, the spectator or participant must accept from a participant conduct associated with that sport. Thus a player who injures another player in the course of a sporting event by conduct that is a foreseeable, customary part of the sport cannot be held liable for negligence because no duty is owed to protect the victim from that conduct. Were we to find such a duty between co-participants in a sport, we might well stifle the rewards of athletic competition.

Id. at 104, 559 N.E.2d 705.

{¶ 15} As a result, primary assumption of the risk negates a negligence claim because no duty is owed to protect against the inherent risks of the recreational activity. *Gentry* at 144, 802 N.E.2d 1116, citing Prosser & Keeton,

The Law of Torts (5th Ed.1984) 496, Section 68; see also *Santho* at ¶ 35; *Gallagher* at 433, 659 N.E.2d 1232. Given this profound impact, courts should proceed with caution when deciding to apply primary assumption of the risk. *Ballinger* at ¶ 9, citing *Gallagher* at 431, 659 N.E.2d 1232.

{¶ 16} Under primary assumption of the risk, the injured plaintiff's subjective consent to and appreciation for the inherent risks are immaterial to the analysis. *Gentry* at 144, 802 N.E.2d 1116, citing *Ramos by Ramos v. Countryside* (1985), 137 Ill.App.3d 1028, 1031–1032, 92 Ill.Dec. 607, 485 N.E.2d 418. Indeed, "those entirely ignorant of the risks of a sport, still assume the risk * * * by participating in a sport or simply by attending the game. The law simply deems certain risks as accepted by plaintiff regardless of actual knowledge or consent." (Footnotes omitted.) *Gentry* at 144, 802 N.E.2d 1116, citing Susan M. Gilles, From Baseball Parks to the Public Arena: Assumption of the Risk in Tort Law and Constitutional Libel Law (2002), 75 Temple L.Rev. 231, 236. In accordance with these principles, our court has previously held:

> [P]rimary assumption of [the] risk requires an examination of the activity itself and not plaintiff's conduct. If the activity is one that is inherently dangerous and from which the risks cannot be eliminated, then a finding of primary assumption of [the] risk is appropriate.

*Gehri v. Capital Racing Club, Inc.* (June 12, 1997), 10th Dist. No. 96APE10–1307, 1997 WL 324175.

{¶ 17} On the other side, under the implied-assumption-of-the-risk defense, a court must engage in a comparative-fault analysis. *Gallagher* at 432, 659 N.E.2d 1232. To prevail on the defense of implied assumption of the risk, a defendant must demonstrate that the injured participant in fact "consented to or acquiesced in an appreciated or known risk." *Gentry* at 144, 802 N.E.2d 1116, citing Restatement (Second) of Torts (1965), Section 496C, Comment *b*.

{¶ 18} In their first and second assignments of error, appellants argue that the proper analysis requires an application of implied, rather than primary assumption of the risk. Appellants attempt to distinguish this matter from the primary-assumption-of-the-risk analysis because the facts of this matter involve a coach's conduct, rather than the conduct of co-participants.

{¶ 19} However, courts have applied primary assumption of the risk in similar instances. See *Sicard v. Univ. of Dayton* (1995), 104 Ohio App.3d 27, 660 N.E.2d 1241 (applying primary assumption of the risk but finding issues of fact regarding whether university employee acted recklessly in spotting weightlifter); *Whitaker v. Davis* (Jan. 27, 1997), 12th Dist. No. CA96–07–060, 1997 WL 30552 (relieving liability of motorcycle owners because "ramping" motorcycle off-road involved an inherent risk of losing control); *Sugg v. Ottawa Cty. Agricultural Soc.* (Apr. 19,

1991), 6th Dist. No. 90–OT–005, 1991 WL 59877 (relieving liability of racetrack owner because collision with another horse was an inherent risk of harness horse racing); *Rodriguez v. O.C.C.H.A.* (Sept. 26, 2000), 7th Dist. No. 99 C.A. 30, 2000 WL 1486449 (relieving liability of sponsor of football game where "trash talk" and hostilities were a part of the game); *Wilson v. Lafferty Volunteer Fire Dept.* (Nov. 29, 2001), 7th Dist. No. 00 BA 29, 2001 WL 1530952 (relieving liability of sponsor of softball game because injury caused by sliding into second base was an inherent risk of the game); *Bundschu v. Naffah* (2002), 147 Ohio App.3d 105, 768 N.E.2d 1215 (relieving liability of driving-range owner because being hit by deflected golf ball was an inherent risk of using the driving range); *Santho v. Boy Scouts of Am.*, 168 Ohio App.3d 27, 2006-Ohio-3656, 857 N.E.2d 1255, (relieving liability of sponsor of ice-skating party, rink owner, and party organizer because falling on ice or crashing into perimeter boards was an inherent risk of ice-rink skating).

{¶ 20} It is clear that courts generally extend primary assumption of the risk to relieve liability of owners, operators, and sponsors of recreational activities. See *Wilson*; *Bundschu*; *Whitaker*; *Rodriguez*; see also *Kline v. OID Assoc., Inc.* (1992), 80 Ohio App.3d 393, 609 N.E.2d 564. Indeed, courts have specifically held: "Non-participants involved in the game may be held to the same standard as participants." *Rodriguez*, 2000 WL 1486449, *2, citing *Kline* at 395–396, 609 N.E.2d 564.

{¶ 21} It is true that our court previously refused to extend *Marchetti* and *Thompson* to nonparticipants. See *Evans v. Wills* (Dec. 27, 2001), 10th Dist. No. 01AP–422, 2001 WL 1652665. In *Evans*, a person was engaged in the recreational activity of walking when she was struck by a person riding a bicycle. Id. at *1. Relying on *Marchetti*, the trial court granted summary judgment in favor of the bicycle rider on the injured walker's negligence claim. Id. at *2. On appeal, our court found that "being struck by a bicycle rider is not a foreseeable or customary risk of walking." Id. at *4. This finding should have been sufficient to determine that primary assumption of the risk did not bar the injured walker's negligence claim. However, through dicta, our court went one step further by expressly refusing to extend the primary-assumption-of-the-risk defense to nonparticipants. Id. at *6.

{¶ 22} Since *Evans*, the Supreme Court of Ohio has generally held that "where injuries are sustained in a sporting event, there is no liability for injuries caused by negligent conduct." *Gentry* at 143, 802 N.E.2d 1116, citing *Marchetti* at paragraph one of the syllabus.

{¶ 23} After *Gentry*, our court had a chance to revisit the issue of whether primary assumption of the risk applies to nonparticipants. See *Santho*. In that case, Jamie Santho was a nine-year-old boy who attended a family skating event

for the members and parents of Boy Scout Troop 210 at the Chiller Ice Rink. *Id.* at ¶ 2–4. Margaret Bennett was both a den leader for the troop and a salaried employee of the rink. *Id.* at ¶ 2–3. Bennett organized the event and provided oversight for a relay race. *Id.* at ¶ 4–5. During Jamie's race, he crashed into the perimeter boards and suffered injuries. *Id.* at ¶ 5. As a result, Jamie and his parents filed suit against Boy Scouts of America, Troop 210's sponsors, Bennett, and the Chiller Ice Rink. *Id.* at ¶ 1–2. After deciding to apply primary assumption of the risk, the trial court granted summary judgment to the defendants on every claim except the alleged recklessness of Bennett, which was resolved upon a directed verdict in favor of Bennett. *Id.* at ¶ 6–7. On appeal, our court held:

> [Appellants] argue that case law has only applied the doctrine [of primary assumption of the risk] in circumstances where the defendant is another participant. However, a recreation provider ordinarily owes no duty to a participant or spectator of an active sport to eliminate the risks inherent in the sport. *Gallagher,* supra. Here, Bennett organized the fun skate for Pack 210, as she had on several previous occasions. That was her main project for the pack. Therefore, Bennett qualifies as a recreation provider. Bennett is relieved of liability under the doctrine of primary assumption of the risk even though she was a nonparticipant in the relay race.

*Id.* at ¶ 13–14. Therefore, our court has previously applied the primary-assumption-of-the-risk defense to nonparticipants. *Id.*

{¶ 24} Similarly, the Twelfth Appellate District has expressly held: "It is not logical to require 'reckless' or 'intentional' conduct for recovery against participants, yet allow recovery against non-participants based upon the lower standard of 'negligence.'" *Whitaker,* 1997 WL 30552, \*3. We agree with this holding when the injuries result from an inherent risk of the activity. Further, we believe this analysis follows the principles set forth in *Gentry, Gallagher, Ceccardi, Marchetti,* and *Thompson.*

{¶ 25} A holding to the contrary would likely shift the focus of the analysis away from the activity and its inherent risks. The analysis would then unnecessarily focus upon the extent of the defendant's involvement and the defendant's classification as a participant, nonparticipant, coach, instructor, official, operator, owner, sponsor, provider, or otherwise. Injured participants would frame their allegations sufficiently to cast a liability net just beyond the reach of *Marchetti* and *Thompson,* with no regard for the inherent risks of the activity.

{¶ 26} We therefore reject appellants' argument that primary assumption of the risk cannot relieve a university of liability based upon the conduct of one of its coaches in a cheerleading practice. Appellants have failed to cite any controlling case law supporting their position.

**{¶ 27}** As a result, and based upon the arguments presented in this matter, we must first determine if suffering an injury due to a fall is an inherent risk of cheerleading. We must then determine if Buchman acted recklessly or intentionally.

**{¶ 28}** As a procedural matter, we note that the case law regarding primary assumption of the risk generally consists of cases resolved upon summary judgment. Conversely, this matter was decided after a bench trial on the bifurcated issue of KSU's liability. As a result, the trial court had the opportunity to reach factual findings in this matter. Therefore, although we review the application of the primary-assumption-of-the-risk defense de novo, we must nevertheless defer to the trial court's factual determinations. *Tejeda v. Toledo Heart Surgeons, Inc.*, 6th Dist. No. L–07–1242, 2009-Ohio-3495, 2009 WL 2096306, ¶ 32, citing *Seasons Coal Co., Inc. v. Cleveland* (1984), 10 Ohio St.3d 77, 79–80, 10 OBR 408, 461 N.E.2d 1273.

**{¶ 29}** In its decision, the trial court held that "the risk of injury due to a fall while performing a mounted stunt is a result of a foreseeable, customary part of the sport of cheerleading." When explaining the support for this finding, the trial court seemingly muddled the analyses of primary and implied assumption of the risk. Specifically, the trial court referenced the testimony of Angela and her former teammates to support the primary-assumption-of-the-risk analysis. We do not suggest that such testimony may never be used in a primary-assumption-of-the-risk analysis. Indeed, the frequency of falls and failed attempts could be evidence supporting or refuting the argument that the risk of injury is inherent in cheerleading. However, in the instant matter, the trial court used this evidence to reach the finding that Angela had a complete appreciation of the risks of cheerleading. Again, however, Angela's actual appreciation of the inherent risks is irrelevant to the primary-assumption-of-the-risk analysis. See *Gentry*, supra; see also *Gehri*, supra. Therefore, whether Angela or her teammates experienced falls is immaterial to this portion of the analysis. So too is the language included in the informed-medical-consent forms that appellants signed. Again, this evidence becomes relevant in determining whether Angela in fact assumed the risk under an implied-assumption-of-the-risk analysis.

**{¶ 30}** Despite the confusion in this regard, we note that the trial court did not err in ultimately finding that injuries related to falls are an inherent risk of cheerleading. Indeed, we need not reverse the trial court's judgment merely because it used improper evidence as the basis for its determination. *Columbus Steel Castings Co. v. King Tool Co.*, 10th Dist. No. 08AP–385, 2008-Ohio-6309, 2008 WL 5104786, ¶ 7, citing *Diamond Wine & Spirits, Inc. v. Dayton Heidelberg Distrib. Co., Inc.*, 148 Ohio App.3d 596, 2002-Ohio-3932, 774 N.E.2d 775, ¶ 25.

**{¶ 31}** Regarding the inherent risks of cheerleading, one court has recognized:

Not so very long ago, a row of docile cheerleaders would say, "rah, rah, rah, sis-boom-bah"—maybe a leg would kick up into the air, perhaps a jump under the cheerleader's own power. This would take the cheerleader a foot or so off the ground. That, however, was yesterday. Today, even appellant recognizes "* * * the acrobatic gymnastic nature of modern cheerleading." It is not unusual for modern cheerleaders to perform gymnastic stunts which may catapult a cheerleader many feet into the air. What goes up, must come down. This includes cheerleaders. Whenever gravity is at play with the human body, the risk of injury is inherent.

*Aaris v. Las Virgenes Unified School Dist.* (1998), 64 Cal.App.4th 1112, 1115, 75 Cal.Rptr.2d 801.

{¶ 32} Appellee's experts opined that injuries are a part of cheerleading. As the head coach of a national-championship-caliber team, Jomo Thompson testified about the injuries that members of his squad suffered. Further, he opined, "all mounts are risky." Thompson also testified that the coach should make sure the degree of risk is minimized. Appellee's other expert, James Albert Lord III, opined that pyramids never hit perfectly. Further, he testified that even qualified spotters make mistakes.

{¶ 33} Appellants' expert, Dr. Steven George, testified about the precarious nature of elevated stunts and human pyramids when he provided:

Cheerleading does hold a unique difference to that of gymnastics in that while both are acrosports,[2] in gymnastics, when a performer goes to perform, they're performing on a—on a piece of apparatus that is stationary, structured, still, solid, and has the exact same performance characteristics every time they use it. * * *

But in cheerleading, in partner stunts and in pyramid building, what you have here is you have an interplay between two or more participants, so it becomes a bit more precarious * * *.

{¶ 34} Dr. George emphasized that coaches should follow the American Association of Cheerleading Coaches and Administrators ("AACCA") safety manual in order to reduce the risks of cheerleading to manageable levels. Additionally, the trial court aptly noted that the following quote is attributable to Dr. George: "Spotting is not 100% fail-safe. Even under the very best of conditions, the window of foreseeability is never fully opened and the element of risk is forever present."

{¶ 35} Therefore, according to the experts, the risk of injury is inherent in cheerleading, particularly when performing elevated stunts and human pyramids.

---

2. Dr. George defined "an acrosport" as a sport involving motion, rotation, and height.

Even when a coach follows the AACCA safety guidelines, the risk is forever present and may only be reduced to manageable levels. Manageable risks are nevertheless risks. It necessarily follows that the risk of injury is incapable of being completely eliminated.

{¶ 36} We therefore find that the trial court did not err by applying the primary-assumption-of-the-risk defense. As such, appellee owed no duty to protect Angela from the inherent risk of injury related to a fall while participating in a mounted stunt or human pyramid. Based upon the claims presented in this matter, appellants may recover only if Buchman acted recklessly or intentionally.

{¶ 37} With regard to this issue, we note that there is neither an allegation nor any evidence supporting the position that Buchman intentionally caused Angela's injury. Instead, appellants argue that Buchman acted recklessly. The Supreme Court of Ohio has outlined the requisite analysis on this issue. See *Thompson v. McNeill* (1990), 53 Ohio St.3d 102, 559 N.E.2d 705:

> "The actor's conduct is in reckless disregard of the safety of others if he does an act or intentionally fails to do an act which it is his duty to the other to do, knowing or having reason to know of facts which would lead a reasonable man to realize, not only that his conduct creates an unreasonable risk of physical harm to another, but also that such risk is substantially greater than that which is necessary to make his conduct negligent." * * *
>
> What constitutes an unreasonable risk under the circumstances of a sporting event must be delineated with reference to the way the particular game is played, *i.e.*, the rules and customs that shape the participants' ideas of foreseeable conduct in the course of a game.

Id. at 105, 559 N.E.2d 705, quoting Restatement (Second) of Torts (1965), 587, Section 500.

{¶ 38} In this regard, the experts described the rules and customs of cheerleading by explaining their experiences and referring to the AACCA safety manual. They presented differing opinions regarding whether Buchman properly ensured that the members of the team, in addition to the team as a whole, were capable and ready to perform the Big K on February 12, 2001.

{¶ 39} Dr. George opined that a specifically defined group must perform proper progressions before attempting a maneuver such as the Big K. He opined that it would be impossible to perform all of the necessary progressions in one day. Further, he opined that by substituting Cobbin before the third attempt, Buchman no longer had a specifically defined group and should have started the progressions from the beginning. Additionally, he opined that a coach does not have the discretion to force a person to perform a difficult and risky stunt when

that person has expressed apprehension about his participation.[3]  According to Dr. George, this is particularly true when the first two attempts at the maneuver have failed.  For these reasons, Dr. George testified that the team, in addition to Cobbin individually, was not performer-ready when it attempted the Big K on February 12, 2001.  As a result, Dr. George opined that Buchman acted recklessly in directing her team to perform the Big K.

{¶ 40} On the other side, Thompson and Albert testified that Buchman met the requirements under the AACCA guidelines.  They emphasized Buchman's level of experience as a cheerleading coach.  They noted that the injury occurred in February, after the team had cheered for an entire football season and half of a basketball season.  They deferred to Buchman on the issue of performer readiness because they opined that only a coach knows when a team and its members are capable of performing a particular maneuver.  They testified that the team performed proper progressions by attempting each side of the pyramid before attempting the pyramid as a whole.  They testified that it is common and necessary to make substitutions in cheerleading.  According to their testimony, a coach has discretion in choosing whether to start progressions from the beginning after a substitution.  For all of these reasons, appellee's experts opined that Buchman did not act recklessly and, in fact, did not even act negligently.

{¶ 41} Having the ability to consider the competing positions, the trial court found that the team was well trained and had performed the proper progressions before attempting the Big K. Further, the trial court found that Buchman did not act recklessly or intentionally.  Therefore, the trial court simply accepted the position of appellee's experts rather than that of the appellants'.  Because this matter proceeded to a bench trial, we must defer to the trial court's factual findings in this regard.  See *Tejeda*, supra.

{¶ 42} Based upon the foregoing analysis, we find that Angela was participating in the recreational activity of cheerleading when she was injured and that there is an inherent risk of injury to cheerleading participants that is incapable of being completely eliminated.  Further, because the trial court found that Buchman did not act recklessly or intentionally in causing Angela's injury, we find that the trial court did not err by finding that primary assumption of the risk barred appellants' negligence and loss-of-consortium claims against KSU. Appellants' first two assignments of error are overruled.

{¶ 43} In appellants' third assignment of error, they argue that the trial court's decision was against the manifest weight of the evidence and constituted a

---

**3.**  Again, we note that the trial court never reached a factual determination on Cobbin's refuted testimony.

miscarriage of justice. In support, appellants refer to the portions of the record that support their position in this matter.

{¶ 44} When implementing a manifest-weight standard of review, however, an appellate court must "[presume] that the findings of the trier of fact [are] correct." Id., citing *Seasons Coal Co.*, 10 Ohio St.3d at 80–81, 10 OBR 408, 461 N.E.2d 1273. The rationale is that the trier of fact had the opportunity to actually observe the witnesses and reach credibility determinations. Id. Therefore, it follows:

> A reviewing court should not reverse a decision simply because it holds a different opinion concerning the credibility of the witnesses and evidence submitted before the trial court. A finding of an error in law is a legitimate ground for reversal, but a difference of opinion on credibility of witnesses and evidence is not.

Id.

{¶ 45} Further, it is well settled that " '[j]udgments supported by some competent, credible evidence going to all the essential elements of the case will not be reversed by a reviewing court as being against the manifest weight of the evidence.' " *State v. Wilson*, 113 Ohio St.3d 382, 2007-Ohio-2202, 865 N.E.2d 1264, ¶ 24, quoting *C.E. Morris Co. v. Foley Constr. Co.* (1978), 54 Ohio St.2d 279, 8 O.O.3d 261, 376 N.E.2d 578, syllabus.

{¶ 46} The essential elements of the liability portion of this case required appellants to demonstrate that appellee breached a duty owed to Angela. In its judgment, the trial court found that primary assumption of the risk barred appellants' claims.

{¶ 47} Based upon our resolution of appellants' first and second assignments of error, the trial court did not err in reaching this finding. Indeed, there was competent, credible evidence demonstrating that Angela's injury was an inherent risk of cheerleading. Additionally, there was competent, credible evidence demonstrating that Buchman did not act recklessly or intentionally.

{¶ 48} As a result, we find that primary assumption of the risk negates appellants' negligence and derivative loss-of-consortium claims. The trial court's judgment was therefore not against the manifest weight of the evidence. Accordingly, we overrule appellant's third assignment of error.

{¶ 49} Having overruled appellants' first, second, and third assignments of error, we affirm the judgment of the Ohio Court of Claims.

Judgment affirmed.

FRENCH, P.J., and SADLER, J., concur.