SCHNETZ et al., Appellees,

v.

OHIO DEPARTMENT OF REHABILITATION AND CORRECTION, Appellant.

[Cite as *Schnetz v. Ohio Dept. of Rehab. & Corr.*, 195 Ohio App.3d 207, 2011-Ohio-3927.]

Court of Appeals of Ohio,
Tenth District, Franklin County.

No. 10AP–959.

Decided Aug. 9, 2011.

David C. Sheldon and Paul J. Kray, for appellees.

Michael DeWine, Attorney General, and Brian M. Kneafsey Jr. and Christopher P. Conomy, Assistant Attorneys General, for appellant.

Dorrian, Judge.

{¶ 1} Defendant-appellant, Ohio Department of Rehabilitation and Correction ("ODRC"), appeals from the judgment of the Court of Claims of Ohio in favor of plaintiffs-appellees, Eric Schnetz and his minor children Chloe, Michael, and Shelby, on their negligence claim. For the following reasons, we reverse.

{¶ 2} In November 2004, plaintiff-appellee, Eric Schnetz ("appellee"), was an inmate serving a one-year sentence for domestic violence at the Mansfield Correctional Camp ("the camp"). The camp is part of the Mansfield Correctional Institution ("MANCI"). The camp houses inmates who have either been convicted of a relatively minor offense or who have exhibited good behavior at MANCI. Inasmuch as inmates at the camp pose less of a security risk, they are afforded greater privileges than the inmates at MANCI. Inmates at the camp are housed in two dormitories.

{¶ 3} Standard staffing levels at the camp include four corrections officers per eight-hour shift. Two corrections officers are assigned to supervise the two dormitories. One corrections officer is stationed in the control center. The fourth corrections officer, known as the perimeter control officer or "floater," is assigned to patrol the recreation yard, the dining hall, the maintenance area, the dormitories, and the camp perimeter. The floater is expected to patrol the entire area approximately once every 30 minutes. The floater's duties include supervising the outside recreation yard during recreation periods.

{¶ 4} Institutional rules of the camp permit inmates to play flag football. Upon an inmate's request, one of the corrections officers issues equipment such as footballs, flags, cones, and down markers for these games. However, institutional rules prohibit inmates from playing full-contact tackle football. All inmates are made aware of this prohibition. As a consequence, the camp does not provide protective gear such as helmets or pads. Despite the prohibition against playing tackle football, the inmates often engaged in such activity when corrections officers were not patrolling the recreation yard. Institutional policy requires a corrections officer who witnesses or otherwise becomes aware of an infraction of the no-tackle rule to intervene and halt the game.

{¶ 5} On November 25, 2004, Thanksgiving Day, the camp housed a total of 389 inmates in its two dormitories. Because it was a holiday, most of the inmates were excused from their work assignments. Several of the inmates, including appellee, organized a flag-football game after lunch. At approximately 1:30 p.m., corrections officer ("CO") Richard Kline, the first-shift floater, opened the equipment room for the inmates to retrieve the flag-football equipment. CO Kline went outside to the recreation yard with the inmates and remained there until approximately 1:45 p.m. He then went inside to the control center, where

he was relieved at 1:50 p.m. by the second-shift floater, CO Wendell Kirgis. According to CO Kline, the football game had not yet begun by the time he left the recreation yard.

{¶ 6} CO Kirgis remained in the control center until around 2:00 p.m. He then went outside to patrol the recreation yard. According to CO Kirgis, he observed 15 to 20 inmates walking, talking, and milling around; none were playing football. After a few minutes, he left the recreation yard and went inside to patrol the dining hall. He then stopped to chat briefly with the corrections officers in both dormitories. Thereafter, he returned to the control center.

{¶ 7} Shortly after CO Kirgis left the recreation yard, the inmates began playing flag football. About 20 minutes into the game, the play became increasingly aggressive and physical and eventually escalated to tackle football. Approximately 45 minutes after the game began, appellee sped toward an opposing ball carrier, inmate Jerome Westfield, preparing to make a tackle. Appellee and Westfield collided; as a result, appellee suffered a serious spinal injury, rendering him a quadriplegic.[1]

{¶ 8} One of the inmates notified CO Kirgis of appellee's injury at approximately 2:50 p.m. According to CO Kirgis, he went outside and observed 200 to 250 inmates gathered around appellee, who was lying immobile on the ground. Several inmates informed CO Kirgis that appellee was injured when he attempted to tackle Westfield.

{¶ 9} On November 22, 2006, appellee filed a complaint against appellant alleging negligence, negligent security, negligent supervision and training, premises liability, and loss of consortium on behalf of his three minor children, and against several John Doe defendants, reckless and wanton conduct. The trial court dismissed the John Doe defendants, struck appellee's requests for punitive damages and attorney fees, and bifurcated the issues of liability and damages.

{¶ 10} On February 19, 2008, appellant filed a motion for summary judgment, contending that appellee's claims were barred by the doctrine of primary assumption of the risk. Appellant argued that appellee assumed the risk of his injury by voluntarily participating in the tackle football game with full knowledge of the risks inherent in such an activity and with full knowledge that institutional rules prohibited that activity. Appellant argued that under such circumstances, it owed no duty to protect appellee from injury.

{¶ 11} In opposition to appellant's motion, appellee argued that the defense of primary assumption of the risk was not available to appellant under the facts of

---

1. The record contains the parties' "Joint Stipulation: Medical Causation," stipulating that appellee's quadriplegia resulted from the collision between appellee and Westfield.

the case because appellant, pursuant to its custodial obligations to incarcerated inmates, owed appellee a duty of care to protect him from known and foreseeable risks of injury. Appellee argued that appellant knew or should have known that the inmates were playing flag football, knew or should have known that the inmates' flag football games sometimes escalated to tackle football, knew or should have known of the risk of injury inherent in playing tackle football, and knew or should have known that institutional policies required corrections officers who observed or were otherwise made aware that inmates were engaged in tackle football to intervene and stop the game. Appellee maintained that appellant breached its duty to protect him from the risks associated with tackle football by failing to properly supervise the recreation yard and intervene and stop the football game once it escalated from flag to tackle.

{¶ 12} By decision and entry filed May 1, 2008, the trial court denied appellant's motion for summary judgment, stating:

This case is clearly distinguishable from those cited by defendant * * * in that plaintiff's injuries in those cases resulted solely from the hazard created by the plaintiff's own negligent conduct. Here, plaintiffs have produced evidence that defendant's negligent failure to supervise the inmates in its custody, including plaintiff, was also a proximate cause of plaintiff's injury.

Defendant acknowledges that inmate participation in tackle football is prohibited by defendant's rules. Defendant also admits that one of the duties of its corrections officers * * * is to patrol the yard to prevent unauthorized activities such as tackle football and to put a stop to such activities when they occur. * * *

The deposition testimony also establishes that whenever inmates wish to participate in a football game they must first inform the [corrections officers] so they may be issued a football and flags. Thus, the [corrections officers] on duty when plaintiff was injured had actual knowledge that football was being played in the yard, albeit the limited contact variety known as flag football. In short, while there is little doubt that plaintiff assumed the risks associated with his play in the game, his negligence may not present a total bar to recovery where the resulting harm may have also been caused, at least in part, by the negligence of defendant. * * * In this case, there is an issue of fact whether defendant knew or should have know[n] that a prohibited game of tackle football was taking place and whether defendant could have or should have stopped the activity prior to plaintiff's injury.

{¶ 13} In August 2008, the trial court conducted a bench trial on liability. Appellee asserted, as relevant here, that appellant's corrections officers failed in their duty to appellee when they either tacitly permitted the inmates to play tackle football or did not discover and terminate the game prior to the time

appellee sustained his injury. Appellant contended, as it did in its motion for summary judgment, that appellee's claims were barred by the doctrine of primary assumption of the risk. Appellant argued that appellee voluntarily assumed a risk of physical injury when he willingly participated in a prohibited game of tackle football.

{¶ 14} By decision and entry filed March 19, 2009, the trial court found in favor of appellee on his negligence claims. The court rejected appellant's primary-assumption-of-the-risk argument, stating:

This case is clearly distinguishable from those in which the doctrine has been applied to recreational or sporting events outside of a prison environment. In this case, as with other cases involving inmates, there is a duty owed by defendant to supervise the conduct of plaintiff which arises from the custodial relationship between the parties. * * * The existence of such a duty is antithetical to the doctrine of primary assumption of the risk. * * * Thus, plaintiff[ ] may recover in this case if it is proven that defendant failed in its duty of supervision and that such a failure was a substantial factor in bringing about plaintiff's injury.

{¶ 15} The court went on to state that while the doctrine of primary assumption of the risk was not applicable to the case, the defense of secondary assumption of the risk was applicable under the circumstances. The court found:

The evidence establishes that defendant knew or should have known that a prohibited game of tackle football was taking place and that defendant could have or should have stopped the activity prior to plaintiff's injury. The evidence, however, also establishes that plaintiff failed to use due care for his own safety when he continued to participate in the game after having knowledge that tackle football was being played and that he could sustain physical injury in such a contest.

{¶ 16} Having so found, the court concluded that appellant's negligence was equivalent to that of appellee and apportioned fault accordingly. The court determined, pursuant to R.C. 2315.33, that appellee's damages should be reduced by 50 percent to account for appellee's contributory fault.

{¶ 17} Following a March 2010 trial on damages, the trial court, on September 13, 2010, filed a decision and entry awarding appellee a total of $8.65 million—$4.5 million for appellee's life care; $1.4 million for past and future lost wages, reduced by $100,000 to account for that portion of past and future wages that were awarded to appellee's three children; $1.25 million for past and future pain and suffering; and $1.5 million for loss of enjoyment of life. The court further awarded appellee's three minor children a total of $160,000. In accordance with its previous decision to reduce the damage award by 50 percent to account for

appellee's contributory negligence, the court awarded $4.325 million to appellee and $80,000 to his three children.

{¶ 18} Appellant asserts six assignments of error on appeal:

1.  The Court of Claims erred in holding that the doctrine of primary assumption of the risk does not apply to prison inmates.

2.  The Court of Claims erred in denying the Department's Motion for Summary Judgment based on primary assumption of the risk.

3.  The Court of Claims erred in finding that the Department was liable for negligence because the doctrine of primary assumption of the risk negates any duty and internal policies do not create a standard of care.

4.  The Court of Claims erred in apportioning liability of 50% to the Department in contradiction of the manifest weight of the evidence and law.

5.  The Court of Claims' determination regarding life expectancy was against the manifest weight of the evidence and contrary to law, resulting in an error in the damages judgment.

6.  The Court of Claims' determination regarding lost income was against the manifest weight of the evidence and contrary to law, resulting in an error in the damages judgment.

{¶ 19} Appellant's first and second assignments of error challenge the trial court's refusal to apply the primary-assumption-of-the-risk defense to the circumstances of this matter. Accordingly, we shall address these assignments of error together.

■ {¶ 20} As noted above, appellee asserted a negligence action against appellant. Therefore, appellee was required to prove the existence of a duty, a breach of that duty, and an injury proximately resulting from that breach. *McDonald v. Ohio Dept. of Rehab. and Corr.*, 10th Dist. No. 02AP–735, 2003-Ohio-513, 2003 WL 231271, ¶ 8, citing *Menifee v. Ohio Welding Prods., Inc.* (1984), 15 Ohio St.3d 75, 77, 15 OBR 179, 472 N.E.2d 707. "Ohio law imposes a duty of reasonable care upon the state to provide for its prisoners' health, care, and well-being." Id., citing *Clemets v. Heston* (1985), 20 Ohio App.3d 132, 136, 20 OBR 166, 485 N.E.2d 287.

■ {¶ 21} Ohio law recognizes three categories of assumption of the risk as defenses to a negligence claim: express, primary, and implied or secondary. *Crace v. Kent State Univ.*, 185 Ohio App.3d 534, 2009-Ohio-6898, 924 N.E.2d 906, ¶ 10, citing *Ballinger v. Leaniz Roofing, Ltd.*, 10th Dist. No. 07AP–696, 2008-Ohio-1421, 2008 WL 802722, ¶ 6, citing *Gentry v. Craycraft*, 101 Ohio St.3d 141, 2004-Ohio-379, 802 N.E.2d 1116, ¶ 11. At issue in appellant's first and second

assignments of error is the applicability of primary assumption of the risk to appellee's negligence claim.

{¶ 22} The doctrine of primary assumption of the risk has historically been applied to cases involving sporting events and recreational activities. *Crace* at ¶ 12, citing *Ballinger* at ¶ 8, citing *Anderson v. Ceccardi* (1983), 6 Ohio St.3d 110, 114, 6 OBR 170, 451 N.E.2d 780. Whether to apply the doctrine of primary assumption of the risk presents an issue of law for the court. *Crace* at ¶ 12, citing *Gallagher v. Cleveland Browns Football Co.* (1996), 74 Ohio St.3d 427, 435, 659 N.E.2d 1232. Accordingly, we review the trial court's decision de novo. *Crace* at ¶ 12, citing *Cleveland Elec. Illum. Co. v. Pub. Util. Comm.* (1996), 76 Ohio St.3d 521, 523, 668 N.E.2d 889, citing *Indus. Energy Consumers of Ohio Power Co. v. Pub. Util. Comm.* (1994), 68 Ohio St.3d 559, 563, 629 N.E.2d 423.

{¶ 23} Under the doctrine of primary assumption of the risk, a plaintiff who voluntarily engages in a recreational activity or sporting event assumes the inherent risks of that activity and cannot recover for injuries sustained in engaging in the activity unless the defendant acted recklessly or intentionally in causing the injuries. *Crace* at ¶ 13, citing *Santho v. Boy Scouts of Am.*, 168 Ohio App.3d 27, 2006-Ohio-3656, 857 N.E.2d 1255, ¶ 12. The doctrine is based on the fiction that the plaintiff has "tacitly consented" to the risk of injury inherent in the activity. *Collier v. Northland Swim Club* (1987), 35 Ohio App.3d 35, 37, 518 N.E.2d 1226. The rationale behind the doctrine is that certain risks are so intrinsic in some activities that the risk of injury is unavoidable. *Crace* at ¶ 13, citing *Collier*. The test for applying the doctrine of primary assumption of the risk to recreational activities and sporting events requires that "(1) the danger is ordinary to the game, (2) it is common knowledge that the danger exists, and (3) the injury occurs as a result of the danger during the course of the game." *Santho* at ¶ 12.

{¶ 24} Primary assumption of the risk completely negates a negligence claim because the defendant owes no duty to protect the plaintiff against the inherent risks of the recreational activity in which the plaintiff engages. *Crace*, 185 Ohio App.3d 534, 2009-Ohio-6898, 924 N.E.2d 906, at ¶ 15, citing *Gentry*, 101 Ohio St.3d at 144, 802 N.E.2d 1116, citing Prosser & Keeton, The Law of Torts (5th Ed.1984) 496, Section 68; see also *Santho* at ¶ 12; *Gallagher*, 74 Ohio St.3d at 431, 659 N.E.2d 1232, quoting Prosser & Keeton, 496–497, Section 28 ("Primary assumption of risk 'is really a principle of no duty, or no negligence, and so denies the existence of any underlying cause of action' "). Primary assumption of the risk serves to negate the duty of care owed by the defendant to the plaintiff. *Wolfe v. Bison Baseball, Inc.*, 10th Dist. No. 09AP–905, 2010-Ohio-1390, ¶ 18. " 'Because a successful primary assumption of risk defense means that the duty

element of negligence is not established as a matter of law, the defense prevents the plaintiff from even making a prima facie case.'" Id. at ¶ 21, quoting *Gallagher* at 432.

{¶ 25} Under the doctrine of primary assumption of the risk, the injured plaintiff's subjective consent to and appreciation for the inherent risks of the recreational activity are immaterial to the analysis. *Crace*, 185 Ohio App.3d 534, 2009-Ohio-6898, 924 N.E.2d 906, at ¶ 16, citing *Gentry*, 101 Ohio St.3d at 144, 802 N.E.2d 1116. "'[T]hose entirely ignorant of the risks of a sport, still assume the risk * * * by participating in a sport * * *[.] The law simply deems certain risks as accepted by plaintiff regardless of actual knowledge or consent.'" *Crace* at ¶ 16, quoting *Gentry* at 144, citing Susan M. Gilles, From Baseball Parks to the Public Arena: Assumption of the Risk in Tort Law and Constitutional Libel Law (2002), 75 Temple L.Rev. 231, 236. In accordance with these principles, this court held in *Gehri v. Capital Racing Club, Inc.* (June 12, 1997), 10th Dist. No. 96APE10–1307, 1997 WL 324175, that "primary assumption of [the] risk requires an examination of the activity itself and not plaintiff's conduct. If the activity is one that is inherently dangerous and from which the risks cannot be eliminated, then a finding of primary assumption of [the] risk is appropriate." Id.

{¶ 26} In *Crace*, this court considered the applicability of primary assumption of the risk. In that case, a cheerleader, Angela Crace, filed a negligence action against Kent State University ("KSU") after she fell during a cheerleading practice and was rendered a paraplegic. On the day Angela was injured, the KSU cheerleading coach assigned members of the cheerleading squad, including Angela, to various positions in a maneuver known as a the "Big K." The Big K was essentially a human pyramid that consisted of a base, a middle layer/base, and flyers; the pyramid was two and one-half people high. Spotters were positioned on the ground to catch the flyers when they dismounted the pyramid.

{¶ 27} Angela and several other members of the KSU cheerleading squad had successfully performed the Big K the previous season. However, many other members of the team had neither performed nor seen the maneuver. On the day Angela was injured, the coach had assigned Angela to the position of flyer. The first two attempts at the mount failed, resulting in Angela's falling from about 15 feet in the air. However, the front spotter caught Angela when she fell. Before the third attempt, the coach substituted a team member who had neither seen nor participated in the Big K as the rear spotter. On the third attempt, the substitute rear spotter failed to catch Angela as she fell from approximately 15 feet in the air. As a result, Angela's fall was unbroken, and she fell to the ground, resulting in immediate paraplegia.

{¶ 28} At issue in the case was whether the doctrine of primary assumption of the risk applied to relieve KSU of liability based upon the conduct of the cheerleading coach. Angela argued that the doctrine applied only to coparticipants in a recreational activity. We disagreed, finding that the primary-assumption-of-the-risk defense applies to coparticipants and nonparticipants alike. In so finding, we noted that a primary-assumption-of-the-risk analysis focuses exclusively upon the activity itself; if the activity is one that is inherently dangerous and from which risks cannot be eliminated, primary assumption of the risk is applicable. *Crace* at ¶ 16, citing *Gehri*, 10th Dist. No. 96APE10–1307, 1997 WL 324175. In so finding, we stated:

> A holding to the contrary would likely shift the focus of the analysis away from the activity and its inherent risks. The analysis would then unnecessarily focus upon the extent of the defendant's involvement and the defendant's classification as a participant, nonparticipant, coach, instructor, official, operator, owner, sponsor, provider, or otherwise. Injured participants would frame their allegations sufficiently to cast a liability net just beyond the reach of *Marchetti* [*v. Kalish* (1990), 53 Ohio St.3d 95, 559 N.E.2d 699] and *Thompson* [*v. McNeill* (1990), 53 Ohio St.3d 102, 559 N.E.2d 705], with no regard for the inherent risks of the activity.

*Crace*, 185 Ohio App.3d 534, 2009-Ohio-6898, 924 N.E.2d 906, at ¶ 25.

{¶ 29} We thus rejected Angela's argument that primary assumption of the risk could not relieve a university of liability for negligence based upon the conduct of one of its coaches in a cheerleading practice. Having so concluded, we next determined whether suffering an injury due to a fall is an inherent risk of cheerleading. We noted that experts for both Angela and KSU testified that the risk of injury is inherent in cheerleading, particularly when performing elevated stunts and human pyramids and that such risks may be reduced only to manageable levels. Upon this evidence, we held that the doctrine of primary assumption of the risk applied, and therefore, KSU owed no duty to protect Angela from the inherent risk of injury related to a fall while participating in a mounted stunt or human pyramid unless the coach had acted recklessly or intentionally. In this regard, we deferred to the trial court's factual finding that the coach had acted neither recklessly nor intentionally. Accordingly, we held that primary assumption of the risk negated Angela's negligence claim.

{¶ 30} In the instant case, the trial court determined that the doctrine of primary assumption of the risk cannot apply to inmate claims against a prison because a prison owes a duty of care to inmates in its custody and control. As we cautioned in *Crace*, however, such a holding shifts the focus of the analysis away from the activity and its inherent risks and improperly focuses upon the extent of the defendant's involvement and the defendant's classification as "participant,

nonparticipant, coach, instructor, official, operator, owner, sponsor, provider, or otherwise." *Crace*, 185 Ohio App.3d 534, 2009-Ohio-6898, 924 N.E.2d 906, at ¶ 25. As *Crace* instructs, a primary-assumption-of-the-risk analysis requires an examination of the activity itself. If that activity is one that is inherently dangerous and from which the risks cannot be eliminated, a finding of primary assumption of the risk is appropriate, absent a finding that the defendant acted intentionally or recklessly in causing the injury. In this case, appellee asserts only that appellant acted negligently in failing to properly supervise the recreation yard and intervene and stop the tackle football game; he does not argue that appellant's conduct was either reckless or intentional.

{¶ 31} We agree with appellant that the trial court's determination that the doctrine of primary assumption of the risk cannot apply to inmate claims against a prison violates the statutory mandate set forth in R.C. 2743.02(A)(1), which provides that the state consents to "have its liability determined, in the court of claims created in this chapter in accordance with the same rules of law applicable to suits between private parties." The statute contains no language distinguishing the claims of prison inmates from the claims of any other plaintiffs. The Supreme Court of Ohio held in *Wallace v. Ohio Dept. of Commerce, Div. of State Fire Marshal*, 96 Ohio St.3d 266, 2002-Ohio-4210, 773 N.E.2d 1018, that "[i]n negligence suits against the state, the Court of Claims must determine the existence of a legal duty using conventional tort principles that would be applicable if the defendant were a private individual or entity." Id. at paragraph one of the syllabus. The doctrine of primary assumption of the risk applies to private parties. *Gentry; Santho*. As noted above, in *Crace*, we applied the doctrine of primary assumption of the risk to a negligence claim asserted against a state university.

{¶ 32} Moreover, as pointed out by appellant, this court has previously stated that all defenses available to private parties are available to the state in defending itself against an inmate's negligence claims. "[T]he state of Ohio may have available to it the common law defenses of contributory negligence and assumption of the risk, if applicable, in a given case." *Fondern v. Ohio Dept. of Rehab. & Corr.* (1977), 51 Ohio App.2d 180, 184, 5 O.O.3d 325, 367 N.E.2d 901. A prison " 'may confront [a negligence] claimant with the ordinary common law defenses—contributory negligence, assumption of risk, and perhaps even the fellow servant rule.' " Id. at 183, quoting *Watson v. Dept. of Rehab. & Corr.* (Mar. 16, 1976), Ct.Cl. No. 75-0204-SC.

{¶ 33} As pointed out by appellant, other jurisdictions have applied the doctrine of primary assumption of the risk to inmate claims against prisons resulting from injuries sustained during recreational activities. These decisions

found no basis to distinguish prison inmates from other plaintiffs in applying the doctrine of primary assumption of the risk.

{¶ 34} In *Mullins v. Blackwell* (N.D.Ga.1967), 283 F.Supp. 462, an inmate sought recovery for injuries sustained when he was struck in the mouth by a baseball while standing on a prison baseball field. A federal court found, "The fact that the plaintiff is a prisoner at a federal institution does not work to alter the application of the assumption of risk doctrine." Id. at 463. The court noted that applicability of the assumption-of-the-risk doctrine might be altered if the plaintiff had been injured while involuntarily performing an assignment in the area. The court found that plaintiff's voluntary status as a spectator subjected him to the same defenses as are available between private parties. Id.

{¶ 35} New York's highest court, in *Marcano v. New York* (2002), 99 N.Y.2d 548, 754 N.Y.S.2d 200, 784 N.E.2d 73, considered an inmate's claim against a correctional facility for injuries sustained when he fell from a set of parallel exercise bars in the recreation yard. The inmate argued that the prison had a duty to give him a warning or instructions spelling out the bars' intended use and advising him that the improper use of the bars could result in injury, or else to supervise inmates' activities in the exercise yard so as to avert any injuries arising from improper use of the equipment. The court overturned an appellate decision and entered summary judgment for the correctional facility, finding that the inmate "assumed the risk of injury when he swung on, and subsequently fell off, an exercise apparatus constructed over a concrete floor." Id.

{¶ 36} In addition, in *Scoma v. United States* (Jan. 7, 2004), E.D.N.Y. No. 02 CV 2970(JG), 2004 WL 40511, another federal court granted summary judgment to the government on an inmate's negligence claim arising from injuries he sustained when he stepped on a drain while playing basketball on the recreation deck of a federal detention center. The court determined that the inmate could not recover for his injuries because he had assumed the inherent risk of playing outdoor basketball on an uneven or irregular surface. The court expressly rejected the inmate's assertion that the defense of primary assumption of the risk is not applicable where the plaintiff is an inmate confined to a detention center and, thus, had no option to play at a different basketball court and, accordingly, did not voluntarily assume any risk. The court stated, "Scoma was not forced to play basketball. The fact that he was an inmate, and thus did not have his choice of venues in which to play, does not alter the applicable legal principles." Id.

{¶ 37} Appellee argues that Ohio courts have grafted an exception to the doctrine of primary assumption of the risk for claims of negligent supervision. In support of this argument, appellee relies principally on three cases—*Kline v. OID Assoc., Inc.* (1992), 80 Ohio App.3d 393, 609 N.E.2d 564; *Rodriguez v. O.C.C.H.A.*

(Sept. 26, 2000), 7th Dist. No. 99 C.A. 30, 2000 WL 1486449; and *Santho*, 168 Ohio App.3d 27, 2006-Ohio-3656, 857 N.E.2d 1255.

{¶ 38} In *Kline*, a player injured during an organized soccer game brought an action against the referee, the owner of the facility where the game was played, and the organizer of the soccer league, alleging that his injuries were caused by their negligent, intentional, or reckless conduct. In addressing the plaintiff's claims, the court stated:

> In a case involving one player against another, the Supreme Court of Ohio determined that before a party may proceed with a cause of action involving injury resulting from a recreational or sports activity, reckless or intentional misconduct must exist. *Marchetti v. Kalish* (1990), 53 Ohio St.3d 95, 99–100, 559 N.E.2d 699. Whether the game is organized, unorganized, supervised or unsupervised, the standard of liability remains the same. Id. at 98, 559 N.E.2d 699. Such a standard strikes a balance between encouraging vigorous and free participation in recreational or sports activities, while ensuring the safety of the players. Id. at 99, 559 N.E.2d 699. The same logic and standard should apply to nonparticipants involved in the game, unless there is evidence of negligent supervision. To successfully state a cause of action under the theory of negligent supervision, the party must produce evidence such as a defendant allowing a player with a known propensity toward violence to play or allowing a team to play when there was a total absence of management. *Brown v. Day* (1990), 68 Ohio App.3d 447, 449, 588 N.E.2d 973, citing *Hanson v. Kynast* (1986), 24 Ohio St.3d 171, 179, 24 OBR 403, 494 N.E.2d 1091 (Holmes, J., concurring).

*Kline*, 80 Ohio App.3d at 395–396, 609 N.E.2d 564.

{¶ 39} Even though *Kline* concluded that the plaintiff had "assumed the ordinary risks of the game," id. at 396, none of the defendants had actually raised the doctrine of primary assumption of the risk as a defense to the plaintiff's claims; accordingly, the court was not asked to analyze whether a negligent-supervision claim acts as an exception to that doctrine. Further, the court noted that the plaintiff had failed to sufficiently raise the issue that the defendants were negligent in the supervision of the game. Accordingly, the court's discussion regarding a claim of negligent supervision is dicta.

{¶ 40} We note as well that the case that *Kline* cited in its discussion of negligent supervision, *Brown v. Day*, did not address the interplay, if any, between a negligent-supervision claim and the doctrine of primary assumption of the risk, as that doctrine was not asserted as a defense. Moreover, in discussing negligent supervision, *Brown* relied upon a concurring opinion in *Hanson v. Kynast*, 24 Ohio St.3d 171, 24 OBR 403, 494 N.E.2d 1091. In *Hanson*, the Supreme Court of Ohio held that under the doctrine of respondeat superior, a

college was not responsible for the injuries that one of its athletes had caused an opposing player during an intercollegiate lacrosse match. The injured player had alleged that the college was accountable for the actions of its athlete due to the existence of a principal-agent relationship. In dismissing the action against the college, the Supreme Court held that the requisite control needed to establish agency did not exist. However, in a concurring opinion, Justice Holmes suggested that a college or university could be held accountable for the actions of its athletes under a theory of negligent supervision. Justice Holmes explained that to successfully state that cause of action, the party must "at the very least, allege negligent supervision, such as allowing a student with a known propensity towards violence to play or allowing a team to play when there is a total absence of management." Id. at 179 (Holmes, J., concurring). Justice Holmes's concurring opinion did not consider whether a claim of negligent supervision would act as an exception to the doctrine of primary assumption of the risk, as that defense was not asserted in the case.

{¶ 41} In *Rodriguez*, the plaintiff played on the defendant's touch football team, which participated in a league sponsored by a county juvenile detention center. During a game between plaintiff's team and another team, the players had engaged in "trash talk" by openly expressing verbal hostilities. A fight ultimately ensued between members of the two teams. The plaintiff was injured when he was struck in the face by a player from the other team. The plaintiff sued his team, claiming that his coach had been negligent in the supervision of the game, as he allowed his team to be exposed to open hostility throughout the game.

{¶ 42} In considering the plaintiff's negligent-supervision claim, the court cited the aforementioned language from *Kline*, which, as we have noted, was dicta and was based upon language set forth in a concurring opinion. Further, as in *Kline*, *Brown*, and *Hanson*, the doctrine of primary assumption of the risk was not raised as a defense, so the court did not consider the negligent-supervision claim in that context.

{¶ 43} In *Santho*, 168 Ohio App.3d 27, 2006-Ohio-3656, 857 N.E.2d 1255, a nine-year-old boy attended a family skating event at a local ice rink for the members and parents of his scouting troop. A woman who was both a den leader for the troop and a salaried employee of the rink had organized the event and had provided oversight for a relay race. During the race, the boy crashed into the perimeter boards and suffered injuries. As a result, the boy and his parents filed suit against the scouting troop, the den leader, and the ice rink, seeking recovery for claims of negligence, reckless/intentional conduct, respondeat superior, and loss of consortium. As relevant here, the trial court granted summary judgment to all defendants on the claim of negligence under the doctrine of primary

assumption of the risk. On appeal, the plaintiffs argued that the trial court had erred in applying the doctrine of primary assumption of the risk to the claims against the den leader because she was not a participant in the relay race. The plaintiffs argued that applicable case law had applied the doctrine only in circumstances in which the defendant is another participant.

{¶ 44} This court, relying on case law holding that a recreation provider ordinarily owes no duty to a participant or spectator of an active sport to eliminate the risks inherent in the sport, held that the den leader, as organizer of the skating event, qualified as a recreation provider and therefore was relieved of liability under the doctrine of primary assumption of the risk even though she was a nonparticipant in the relay race. In a footnote, this court noted that the plaintiffs had argued that negligent supervision should apply instead of the doctrine of primary assumption of the risk. After citing the aforementioned language from *Kline* and *Rodriguez* pertaining to negligent-supervision claims, we determined that because the den leader supervised the relay race, negligent supervision did not apply to the case.

{¶ 45} Although the doctrine of primary assumption of the risk was at issue in *Santho*, we reiterate that the language in *Kline* regarding negligent supervision was dicta and was based upon language in a concurring opinion. Further, as noted above, this court's discussion of the issue was contained in a footnote and was thus dicta.

{¶ 46} Appellee finally suggests that *Crace* "revisited primary assumption of the risk and negligent supervision." The *Crace* plaintiffs raised claims of negligence and loss of consortium based upon the cheerleading coach's conduct in substituting a novice spotter who was totally unfamiliar with the cheerleading maneuver that resulted in the plaintiff's injury. The plaintiffs argued that a primary-assumption-of-the-risk analysis was improper when the facts of the matter involve a coach's conduct, rather than the conduct of coparticipants. As noted in our discussion of *Crace* above, we determined that the primary-assumption-of-the-risk defense applies to coparticipants and nonparticipants alike. We accordingly concluded that the doctrine of primary assumption of the risk could be applied to relieve a university of liability based upon the conduct of one of its coaches in a cheerleading practice. Contrary to appellee's assertion, our determination was not based upon the fact that there was "active supervision" by the coach at the time of the injury.

{¶ 47} For these reasons, we are not persuaded by the case law that appellee cites that a claim of negligent supervision is an exception to the doctrine of primary assumption of the risk in this case. As noted above, under the doctrine of primary assumption of the risk, a plaintiff voluntarily engaged in a recreational activity assumes the inherent risks of that activity and cannot recover for injuries

sustained while engaging in that activity unless the defendant acted recklessly or intentionally in causing the injuries. *Crace*, 185 Ohio App.3d 534, 2009-Ohio-6898, 924 N.E.2d 906, at ¶ 13.

{¶ 48} Finally, appellee argues that a negligent-supervision exception exists here because of appellant's duty to supervise "the conduct of appellee," which arises from the custodial relationship between the parties. However, the facts of this case do not invoke that duty. The conduct of appellee, participating in a football game and initiating a tackle, did not arise from his custodial relationship with appellant. His conduct was voluntary, and there is no evidence suggesting that such conduct was required or mandatory as a result of appellee's being imprisoned. In defining the duty that arises from the custodial relationship, appellee cites the Restatement of Torts, Second, Section 314A(4), which reads: "One who is required by law to take * * * the custody of another under circumstances such as to deprive the other of his normal opportunities for protection is under a similar duty to the other." Here, appellant did not deprive appellee of his "normal opportunities for protection"; rather, appellee created his own need for protection by voluntarily participating in the football game and initiating the tackle. Appellee further cites the dereliction-of-duty statute at R.C. 2921.44(C)(3), which states: "No officer, having charge of a detention facility, shall negligently do any of the following: * * * (3) [f]ail to control an unruly prisoner, or to prevent intimidation of or physical harm to a prisoner by another." Here, it was appellee, not another prisoner, who caused the physical harm. Therefore, we reject appellee's argument that a specific exception applies to assumption of risk in this case for negligent supervision.

{¶ 49} Accordingly, we hold that the trial court erred in concluding that the doctrine of primary assumption of the risk did not apply to appellee's claims against appellant. There is no question that appellee was voluntarily participating in a recreational activity—football—at the time he was injured. Injury resulting from colliding with another player on the field of play, even accidentally, is an ordinary danger of the sport of football. Here, appellee admitted that he continued to participate in the game after it escalated from flag to tackle. Tackle football is an undeniably high-contact sport, and the risk is great that a player could be injured while participating in the sport, especially when, as here, the players do not wear protective padding or helmets. Appellee admitted that he intentionally tackled Westfield, and it is undisputed that appellee's injuries directly resulted from the collision that ensued during that tackle.

{¶ 50} The trial court found that appellee had assumed the risk of his injury in both its decision on summary judgment and its decision following the liability trial denying appellant's summary judgment motion. In denying appellant's summary judgment motion, the court stated, "[T]here is little doubt that plaintiff assumed the risks associated with his play in the game." After conducting the bench trial,

the court found, "[I]t is * * * evident to the court that plaintiff willingly participated in a prohibited tackle football game and thus assumed a risk of injury." Under the doctrine of primary assumption of the risk, appellant owed no duty to protect appellee from the inherent risk of injury related to his voluntary decisions to both participate in a game of tackle football and to tackle another inmate during the course of that game. As the doctrine of primary assumption of the risk applies to negate the duty element of appellee's negligence claim, appellee was precluded from making a prima facie case of negligence, and the trial court erred in failing to render judgment in favor of appellant as a matter of law. We thus sustain appellant's first and second assignments of error.

{¶ 51} Appellant's remaining assignments of error challenge the trial court's determinations regarding the apportionment of liability between the parties and the damages awarded appellee. Our disposition of appellant's first and second assignments of error renders these assignments of error moot. App.R. 12(A)(1)(c).

{¶ 52} For the foregoing reasons, appellant's first and second assignments of error are sustained and its third, fourth, fifth, and sixth assignments of error are moot. We reverse the judgment of the Court of Claims of Ohio and remand this matter to that court for further proceedings in accordance with law and consistent with this decision.

Judgment reversed
and cause remanded.

BROWN and FRENCH, JJ., concur.