OPINION
{¶ 1} On December 18, 2003, defendants-appellees Leaniz Roofing, Ltd. and Sylvia M. Vasquez were installing a new roof on plaintiff-appellant, Philip W. Ballinger's, Columbus, Ohio home. During the course of the installation, Dr. Ballinger had several discussions with Ms. Vasquez concerning the placement of a dryer vent, and ultimately, he climbed the ladder to his roof to show the roofers where to place the vent. Upon his first trip to the roof, Dr. Ballinger was unable to give specific instructions because the roofers had not progressed far enough in removing the old roof. Dr. Ballinger therefore *Page 2 
made a second trip to the roof several hours later. On this second trip, before Dr. Ballinger safely reached the roof, the ladder slipped, and he fell to the ground, sustaining substantial physical injuries. He sued the roofers for negligence in raising the ladder, and for failing to warn him of the ladder's unstable condition.
 {¶ 2} The trial court granted summary judgment in favor of the defendant roofing company, on the grounds that Dr. Ballinger had assumed the risk of injury by climbing the ladder, and further found that Dr. Ballinger was barred from recovery because he was more at fault than the defendants. Dr. Ballinger appeals from that ruling. Ohio recognizes the common law tort defense of primary assumption of risk, which serves as a complete bar to recovery for a defendant's alleged negligence. Because the facts show that Dr. Ballinger was aware of the risks associated with climbing the ladder, which is an inherently dangerous activity, and he voluntarily proceeded to do so anyway, despite knowing and recognizing that the ladder was not properly positioned, he is barred from recovery. Summary judgment was proper.
 {¶ 3} Dr. Ballinger assigns two errors for our consideration:
 [I.] THE TRIAL COURT ERRED IN FINDING THAT THE APPELLANT KNEW THE LADDER TO BE PATENTLY DANGEROUS, AND THUS IN APPLYING THE DOCTRINE OF PRIMARY ASSUMPTION OF RISK.
 [II] THE TRIAL COURT ERRED BY RAISING ITS OWN ARGUMENT, SUA SPONTE, AS FURTHER SUPPORT FOR ITS AWARD OF SUMMARY JUDGMENT.
 {¶ 4} We review the appropriateness of granting a motion for summary judgment de novo, using the same standard used by the trial court, as provided by Civ.R. 56(C). See, e.g., Boroff v. Meijer Stores Ltd.Partnership, Franklin App. No. 06AP-1150, 2007-Ohio-1495, *Page 3 
at ¶ 7; Smiddy v. Wedding Party, Inc. (1987), 30 Ohio St.3d 35. A court may grant summary judgment when, after construing the evidence in a light most favorable to the non-moving party: (1) there is no genuine issue of material fact; (2) the moving party is entitled to judgment as a matter of law; and (3) reasonable minds can arrive at only one conclusion — that conclusion being favorable to the party moving for summary judgment. Boroff, ibid. (citing Zivich v. Mentor Soccer Club,Inc. [1998], 82 Ohio St.3d 367, 369-370).
 {¶ 5} To maintain an action for negligence in this state, a plaintiff has the burden of establishing, by a preponderance of the evidence: (1) that defendant owed plaintiff a duty of care; (2) a breach of that duty; and (3) injury proximately caused by the breach. See, e.g.,Boroff, at ¶ 8 (citing Menifee v. Ohio Welding Products, Inc. [1984],15 Ohio St.3d 75, 77). When a defendant shows, however, that the plaintiff assumed the risk of injury through participating in an inherently dangerous activity, this defeats the existence of a duty of care. SeeGallagher v. Cleveland Browns Football Co. (1996), 74 Ohio St.3d 427,431 ("[A] plaintiff who primarily assumes the risk of a particular action is barred from recovery as a matter of law."); see, also, Prosser Keeton, Law of Torts (5 Ed. 1984) 496-497, Section 68.
 {¶ 6} Ohio law now recognizes three different variations of the common law affirmative defense of assumption of risk — express, primary, and secondary/implied. See, e.g., Gentry v. Craycraft, 101 Ohio St.3d 141,2004-Ohio-379, at ¶ 11; Anderson v. Ceccardi (1983), 6 Ohio St.3d 110,114.
 {¶ 7} Express assumption of risk occurs when parties to a contract agree to a release of liability. Express assumption of risk therefore has no application here. *Page 4 
 {¶ 8} Primary assumption of risk has historically been applied in cases involving sporting events. See, e.g., Anderson, at 114. The rationale is that since baseballs are batted with great swiftness and no precise accuracy, spectators who may be hit by errant fly balls assume that risk as a part of viewing the sport. See Cincinnati Baseball ClubCo. v. Eno (1925), 112 Ohio St. 175, 180-181; Collier v. Northland SwimClub (1987), 35 Ohio App.3d 35, 37. Primary assumption of risk relieves the defendant of the duty of care, which defeats the plaintiff's prima facie negligence case. See Prosser, supra. Secondary, or implied assumption of risk, occurs when the plaintiff consented to or acquiesced in an appreciated or known risk. See 2 Restatement of the Law 2d, Torts Section 496C, Comment b; see, also, Collier, at 38. This includes those situations where the risk is so obvious that plaintiff must haveknown and appreciated the risk. Id. at 37.
 {¶ 9} Because of its extraordinary reach — an absolute bar to the plaintiff's recovery — primary assumption of risk is an extraordinary remedy, which should be used only in extraordinary cases. See, e.g.,Gallagher, at 431; see, also, Cincinnati Baseball, at 180-181 (applying the primary assumption of risk doctrine); cf. Collier, ibid. (holding that the defense of assumption of risk as applied to diving accidents is one of implied, rather than primary).
 {¶ 10} As we noted in Collier, there are chiefly two reasons necessitating the distinction between primary and implied assumption of risk. First is the underlying rationale for primary assumption of risk: because some activities are so inherently dangerous, the risk of injury is unavoidable. Id. at 38. Other activities, while potentially dangerous, can be enjoyed without injury if due care is taken. For example, there is obviously some risk of injury diving into a shallow pool; but it can be done safely — *Page 5 
"proper instruction, warnings[,] and supervision on diving can, and do, minimize the risk." Id. Thus, the risk is not so inherent as to categorically relieve pool operators from owing any duty whatsoever to their patrons. A rule providing otherwise would suggest that all divers know of and accept the risk, regardless of their level of experience. See id.
 {¶ 11} The second reason for the distinction between primary and implied assumption of risk is that when a plaintiff impliedly assumes a risk, it is a voluntary acknowledgment that the potential for injury exists. Schwartz, Comparative Negligence 2 Ed.1986) 179, Section 9.5. Understanding that there are risks involved, however, does not serve as a naked license (i.e., consent) to suffer any injury. In this regard, implied assumption of risk acts more like contributory negligence than primary assumption of risk. Id.
 {¶ 12} In Collier, we found that the plaintiff lacked significant knowledge of any of the potential risks associated with diving, and that the pool operator should not be absolved of all duty to the plaintiff. Id. at 38. We believed that the plaintiff might have carelessly proceeded with her diving without actually agreeing to accept the risk, which was not the same as the baseball game spectator who knows he may be injured by an errant fly ball, but attends the game nonetheless. Because of that distinction, we held that traditional negligence concepts were more appropriate than the harsher, "no duty" standard. See id.
 {¶ 13} Turning to the facts in this case, the activity in question is ladder climbing. It is common knowledge that climbing ladders is an inherently dangerous activity — that is why people take extreme care when doing so. Failure to take due care when climbing a *Page 6 
ladder will often result in losing one's balance, falling from the ladder, or causing the ladder itself to fall. For these reasons, ladders carry conspicuous warning labels (at least the ones used for commercial purposes). Thus, we hold that ladder climbing in this case is a type of inherently dangerous activity that is subject to primary assumption of risk.
 {¶ 14} In his deposition, Dr. Ballinger testified to facts confirming that he himself appreciated the potential danger associated with climbing the ladder to his roof:
 Dr. Ballinger: I believe it was an aluminum extension ladder; whether it had one or two sections, I do not recall. I think it may have had two sections to the ladder, however, but only one was — only took about one to get up to the approximately 12-foot, I'm guessing, 12-or 14-foot area on the roof over the driveway.
 Counsel: Okay. Now, I've used extension ladders like that. Do you remember there being two rungs for your feet to be on because the extension hasn't been raised, or what do you remember?
 A. I don't recall. I don't recall.
 Q. Okay. And I've — what was the positioning of those little footpads on the ladder? First off, did it have those footpads on the ladder?
 A. Yes, it did.
 Q. And are these the footpads that kind of have a pendulum ability to them so that they'll try to stay level or attached to the ground?
 A. Automatic leveling?
 Q. No, I'll take that back.
 A. Okay.
 Q. Did they — you know, they can swing on a pivot here, so this would be the footpad, this would be looking sideways? *Page 7 
 A. Oh, this is the side angle?
 Q. Side angle.
 A. Oh, okay. Side angle. That appears, yes. The scale is not quite correct.
 Q. I'm not an artist either.
 A. Nor am I.
 Q. So they are the type of footpads that kind of hang loose at the bottom of a ladder and can swing a little bit to try to be firm or flat —
 A. To keep it level, that's correct.
 Q. In what position were those footpads on the morning of your second trip up the ladder?
 A. I believe they may have been turned up.
 Q. Okay. So they weren't in contact with the driveway?
 A. Not those pad things, no.
 Q. Okay. And this is something you observed before you went up the ladder that day?
 A. I did.
 * * *
 Q. Okay. Is there anything that prevented you from repositioning the ladder that day on the second trip up?
 A. I'm not the ladder expert. It was there, and the workers were on the roof.
 Q. Again, the simple question was: Was there anything that prevented you from repositioning the ladder?
 A. No.
 Q. All right. Physically[,] you were capable of doing that? *Page 8 
 A. Yes.
 Q. Okay. Was there anything else that you perceived was a problem with the ladder's position the second trip up?
 A. The angle looked a little steep.
 Q. All right. Anything else?
 A. No.
 Q. Now, it's my understanding that the fall doesn't start to occur until you're trying to exit the ladder to get onto the roof, or am I incorrect in that?
 A. The fall?
 Q. Yeah, the — the ladder is shifting. The motion that leads to the fall doesn't start to happen until you're at the top of your travel to the roof and you're trying to get off the ladder; is that how it happened? Is that when it happened?
 A. That is correct. I had both hands, and my feet were climbing the ladder. As I stepped, I believe, to my left in an attempt to step off onto the roof-
 Q. Okay.
 A. — the ladder began sliding — the feet of the ladder began sliding down.
 Q. All right. Is your foot on the roof when this happens?
 A. My left foot was onto the roof, my right foot and both hands were still on the ladder.
(Ballinger Depo. 34-35, 39, 40-41.)
 {¶ 15} Despite this testimony, Dr. Ballinger argues that ladder climbing is not inherently dangerous. (Appellant's brief, at 6.) "To warrant [s]ummary [judgment, it was incumbent upon the [defendants to demonstrate that [Dr. Ballinger] knew that the ladder *Page 9 
upon which he was climbing was patently dangerous. Further, the ladder would have to have been so dangerous that there was no way the danger could be eliminated." Id. at 8. To the contrary, no party to this lawsuit has ever alleged that the ladder itself was "patently dangerous," defective, or otherwise substandard. In this case, it is not the apparatus that poses danger. It is the activity of climbing the ladder, especially when one is aware that the ladder is not properly positioned.
 {¶ 16} Dr. Ballinger implies, however, that he should not be held to the same standard (to ensure his own safety) as the roofers who successfully went up the ladder at an earlier time, because he is not a "ladder expert."
 Counsel: Okay. Is there anything that prevented you from repositioning the ladder that day on the second trip up?
 A. I'm not the ladder expert. [The ladder] was there, and the workers were on the roof.
 * * *
 Q. Do you recall having any concerns with going up the ladder the first time?
 A. One is always concerned when going up any ladder.
(Ballinger Depo., at 39, 44.)
 {¶ 17} Dr. Ballinger testified that he fell from the roof while exiting the ladder — i.e., during the transfer from ladder to roof. (See id. at 40-41.) Transferring from a ladder to a stationary object can be quite daunting. When you are on the ladder, your weight is distributed fairly equally between your two feet and somewhat between your two hands. The moment you take one foot off the ladder (as Dr. Ballinger did), the weight distribution changes dramatically, which can easily cause the ladder to shift in the direction of the foot *Page 10 
that is still planted firmly on the ladder. Poor technique in this regard would foil even the most perfectly erected ladder.
 {¶ 18} Ordinarily, the question of whether the plaintiff assumed the risk of injury is a factual question for the jury, however, here, Dr. Ballinger's testimony is uncontroverted. Thus, there is no factual dispute. Summary judgment is appropriate when there is no genuine issue of material fact for the jury to determine. Given Dr. Ballinger's testimony, there is no question left for a jury to decide. Summary judgment was therefore proper, and we overrule the first assignment of error.
 {¶ 19} In the second assigned error, Dr. Ballinger alleges that the trial court erred by raising its own argument supporting summary judgment for the defendant. The portion of the decision below with which appellant takes issue appears in the last page thereof: "Further, even if primary assumption of risk did not apply to bar Plaintiff's claims, Defendants are nonetheless entitled to summary judgment based on Plaintiff's comparative negligence." (Decision, at 4.) Appellant contends that this was improper because the defendants' motion for summary judgment did not specifically address comparative negligence, and that the trial court developed this novel argument to appellant's prejudice. Appellant's argument is not well-taken.
 {¶ 20} Whenever a plaintiff's own negligence may have contributed to an injury, the doctrine of comparative negligence will serve to reduce the defendant's liability for plaintiff's injuries. Ohio is a "partial comparative negligence" jurisdiction, meaning that a defendant will not be liable to a plaintiff whose fault was 50 percent or more. See R.C.2307.22. *Page 11 
 {¶ 21} Appellant cites to several cases for the proposition that the trial court cannot grant summary judgment sua sponte, however, none of these cases are applicable here. See, e.g., Flood Co. v. St. Paul Fire Marine Ins. Co., Summit App. No. 21679, 2004-Ohio-1599, at ¶ 12
(holding that trial courts must give notice to the parties before converting a motion to dismiss into a motion for summary judgment);Eller v. Continental Invest. Partnership, 151 Ohio App.3d 729, 732,2003-Ohio-894, at ¶ 16 (holding that a trial court cannot grant summary judgment as to damages when proof of damages has not been submitted);Mitseff v. Wheeler (1988), 38 Ohio St.3d 112, syllabus ("A party seeking summary judgment must specifically delineate the basis upon which summary judgment is sought in order to allow the opposing party a meaningful opportunity to respond.").
 {¶ 22} These cases all hold that it is improper to grant summary judgment when the non-moving party has not had notice that summary judgment may be entered against him. This was not the case here.
 {¶ 23} Dr. Ballinger alleges surprise that the trial court found that he was at least 50 percent at fault, and in effect claims that it was unreasonable for him to anticipate such a finding. (See Appellant's brief, at 14.) ("The opposing party is required to rebut the evidence and the legal argument presented, but not to anticipate new arguments or angles added by the trial court. In this case, no one but the trial court submitted that Phillip Ballinger had to be, beyond the disagreement of reasonable minds, more than 50% at fault for his fall.") Given that the defendants' entire defense was premised on primary assumption of risk, Dr. Ballinger must have been on notice that his own fault was then at issue. *Page 12 
 {¶ 24} Finally, the trial court only mentioned in passing that Dr. Ballinger's comparative negligence barred his recovery. This was not a principal reason for the trial court's ruling. Based on our analysis that Dr. Ballinger primarily assumed the risk of injury, the latter portion of the trial court's decision, which references comparative negligence, could be stricken without having any effect on the outcome of the case. For these reasons, we overrule the second assignment of error.
 {¶ 25} Having overruled both assigned errors, we affirm the decision of the Franklin County Court of Common Pleas.
Judgment affirmed.
 McGRATH, PJ., and BROWN, J. concur. *Page 1