[Cite as *Peterson v. Natl. Sec. Assoc., Inc.*, 2018-Ohio-2905.]

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

| | | |
|---|---|---|
| Robert J. Peterson et al., | : | |
| Plaintiffs-Appellants | : | |
| v. | : | No. 17AP-39 |
| | | (C.P.C. No. 10CV-12611) |
| Randy Martyn, | : | |
| Defendant-Appellee | : | (REGULAR CALENDAR) |
| National Security Associates, Inc. et al., | : | |
| Defendants-Appellees. | : | |

D E C I S I O N

Rendered on July 24, 2018

> **On brief**: *J.C. Ratliff, Jeff Ratliff*, **and** *Rocky Ratliff*, for appellants. **Argued**: *Jeff Ratliff.*
>
> **On brief**: *Michael R. Szolosi, Jr., LLC*, **and** *Michael R. Szolosi, Jr.*, for Randy Martyn. **Argued**: *Michael R. Szolosi, Jr.*
>
> **On brief**: *Isaac Wiles Burkholder & Teetor, LLC, Brian M. Zets*, and *Dale D. Cook*, for defendants-appellees Gahanna Police Department and Sergeant James Graham. **Argued**: *Brian M. Zets.*

APPEAL from the Franklin County Court of Common Pleas

BROWN, P.J.

{¶ 1} Plaintiffs-appellants, Robert J. Peterson ("Peterson"), and his wife Heidi Peterson, appeal from a judgment of the Franklin County Court of Common Pleas, granting the motions for summary judgment of defendants-appellees, the Gahanna Police

Department ("GPD"), Sergeant James Graham, and Randy Martyn. For the following reasons, we reverse.

{¶ 2} On August 26, 2010, appellants filed a complaint against National Security Associates, Inc., Martyn, GPD, Graham, and the city of Columbus. The complaint asserted claims of negligence, recklessness, negligent training, negligent supervision, negligent hiring, respondeat superior, and loss of consortium. Appellants later dismissed National Security Associates, Inc. and the city of Columbus from the action. The events giving rise to the complaint occurred on August 26, 2008, when Peterson was injured during an explosive breaching training at the Columbus bomb range.

{¶ 3} At the time of his injury, Peterson was an Ohio State Highway Patrol ("OSHP") state trooper, and a member of OSHP's special response team. OSHP's special response team trained in explosive breaching, which involves detonating an explosive device on the door or window of a building to breach the structure so officers can enter the building.

{¶ 4} In 2008, OSHP asked Martyn if he would teach a week-long explosive breaching seminar to members of OSHP's special response team. Martyn was a certified master breacher for the United States Army and had "taught explosive breaching to over 1,000 military and law enforcement personnel." (Martyn Depo. at 12.) In his civilian capacity, Martyn worked as an officer for GPD.

{¶ 5} Martyn agreed to teach the course, and OSHP agreed to pay Martyn $500 per student for the following OSHP members to attend the course: Sergeant Mike Kemmer, Trooper Eli Rivera, Trooper Robert Peterson, Trooper Seth Douthitt, Trooper Erik Lofland, and Trooper Rick Tocash. Although Peterson was already certified in advanced explosive breaching, some of the other OSHP members had not received any formal training in explosive breaching before the 2008 course.

{¶ 6} Two members of GPD, Graham, and Detective John Power, attended the course for free. Graham had never detonated an explosive before the 2008 seminar, but had attended a training where Martyn showed members of GPD's SWAT team "some of the tactics and things that went along with explosive breaching." (Graham Depo. at 10.)

{¶ 7} The first day of the seminar, August 25, 2008, consisted of eight hours of classroom instruction at OSHP's academy. On the second day of the seminar, the class went

to the Columbus bomb range to practice constructing and detonating explosives. The bomb range had a pavilion area where students would construct the charges, and a separate area with a structure where the explosives would be detonated.

{¶ 8} Peterson and Graham were both back in the pavilion constructing charges during the first two detonations of the August 26, 2008 training. Although Graham stated that he "did not hear the sequence on the first two shots," Peterson testified he heard the "highway patrol procedure for the shot, the command to detonate" utilized during the first two shots. (Graham Depo. at 23; Peterson Depo. at 49.) OSHP's shot sequence consists of "three fire in the hole announcements," followed by the commands "this is the commander, I have control, stand by, stand by, go." (Peterson Depo. at 57.)

{¶ 9} The third shot of the day was a 300 grain flex linear charge. Martyn approved the construction of this charge, and informed the class it was "a fragmentation producing type charge" and "a dangerous shot." (Martyn Depo. at 86; Douthitt Depo. at 70.) After constructing the charge, a group consisting of Douthitt, Lofland, Tocash, Power, Peterson, and Graham took the charge up to a door on the breaching structure. Graham was chosen to be the person who would detonate the charge, known as the primary breacher. The primary breacher had the duty of checking the open area to ensure it was clear before detonating the charge. (*See* Kemmer Depo. at 71-72; Martyn Depo. at 73; Peterson Depo. at 174; and Douthitt Depo. at 29-30.)

{¶ 10} After placing the charge, the group retreated "behind the corner of the facade" of the breaching structure. (Peterson Depo. at 74, 76.) Once behind the facade, Peterson became concerned about the whereabouts of those not in the group. Peterson stated that he touched Graham, and said "hang on a second. Show me the detonator, which is - - which is a two piece plunger-type detonator." (Peterson Depo. at 80.) Graham showed him "the two pieces. [Peterson] said, keep it like that. I'm going to go out here and make sure everybody is behind cover." (Peterson Depo. at 81.) Graham, however, testified that Peterson never said anything to him after they had retreated behind the facade.

{¶ 11} Peterson walked out into the open area and called out to let the others know "we're getting ready to blow this." (Peterson Depo. at 81.) Peterson stated that "Randy and Mike and Jim moved to cover. Ely assured me he was behind cover." (Peterson Depo. at 81.) As Peterson was walking back to the facade, he started yelling out the fire in the hole

announcements. Peterson explained that it was common to yell the fire in the hole commands out before reaching cover "[b]ecause you're yelling it to the area" to alert others that an explosion is about to occur and, thus, want to be "in a position that" others "see [you] and hear [you]." (Peterson Depo. at 191-92.) As Peterson "started to say the third fire in the hole, the blast [was] detonated." (Peterson Depo. at 82.)

{¶ 12} Graham recalled the incident differently. Graham testified that, after the group retreated behind the facade, he looked out into the open area and made a 180 degree view, panning from left to right, and saw "no one in the open area." (Graham Depo. at 48.) Lofland did not "believe" Graham looked out into the open area before detonating the charge, as Lofland saw Graham crouched "behind the wall kind of locked in on the initiator." (Lofland Depo. at 37.)

{¶ 13} Graham testified that he, not Peterson, yelled out the fire in the hole commands, and that he initiated the charge after yelling out the third fire in the hole command. Graham explained GPD's shot sequence was simply "fire in the hole, fire in the hole, fire in the hole." (Graham Depo. at 14.)

{¶ 14} Peterson was "[a] couple of steps out" from the facade when the blast occurred. (Peterson Depo. at 88.) Fragmentation from the charge hit Peterson's left leg. Immediately after the explosion, Peterson "looked at Graham" and said "what the hell? And [Graham] said, we go on the third fire in the hole." (Peterson Depo. at 98.) The other class participants applied pressure to Peterson's leg until an ambulance arrived.

{¶ 15} Every student of the August 2008 explosive breaching seminar testified that Martyn never discussed a shot sequence with the class before Peterson's injury. (*See* Peterson Depo. at 60-62; Graham Depo. at 15; Tocash Depo. at 26; Douthitt Depo. at 27; Kemmer Depo. at 33; Rivera Depo. at 50; Lofland Depo. at 24; and Power Depo. at 18.) The participants who had attended other explosive breaching training seminars in the past testified that, at those previous courses, the course instructor would inform the class of the shot sequence the participants were to utilize during the class. (*See* Peterson Depo. 59-60; Douthitt Depo. at 15; Kemmer Depo. at 33-34.) Rivera testified that, if Martyn "would have gone over this - - the shot protocol, this [accident] wouldn't have happened." (Rivera Depo. at 85.)

{¶ 16} Martyn, however, testified he did discuss a shot sequence with the class. Martyn stated he went over the shot sequence "twice" during the first day of the seminar, noting it was on a powerpoint slide and "was also in a video." (Martyn Depo. at 84.) The shot sequence Martyn told the students to use was "I have control, I have control, I have control and then stand by," and then a count down of five, four, three, two, one, and on the "wh" of one, the charge was to be detonated. (Martyn Depo. at 29-30.)

{¶ 17} On February 15, 2013, Martyn filed a Civ.R. 56 motion for summary judgment. Martyn asserted that appellants had failed to establish he breached any standard of care, and Martyn filed his affidavit with the motion averring that he met his duty of care to the training participants. Martyn further asserted that primary assumption of risk barred appellants' negligence claims, as Peterson had voluntarily participated in the inherently dangerous activity of explosive breaching.

{¶ 18} GPD and Graham filed a joint Civ.R. 56 motion for summary judgment on February 15, 2013. GPD argued it was not capable of being sued, as it was not a political subdivision. Graham argued he was immune from Peterson's negligence claims, pursuant to R.C. 2744.03(A)(6), and that he had not acted recklessly.

{¶ 19} On March 19, 2013, appellants filed memoranda contra appellees' motions for summary judgment. Appellants argued that Martyn owed Peterson "the duty imposed upon a teacher or instructor [which] is one of ordinary and reasonable care for the safety of his students," and that Martyn breached this duty by failing to instruct the students regarding the shot sequence they were to use during his class. (Appellants' Memo Contra to Martyn's Mot. for Summ. Jgmt. at 12.) Appellants asserted that primary assumption of risk did not apply to the facts of the case, as "the risks associated with being a student in a controlled training exercise for the Ohio State Highway Patrol [were] not readily foreseeable as a matter of law." (Appellants' Memo Contra to Martyn's Mot. for Summ. Jgmt. at 23.)

{¶ 20} Appellants argued that GPD was capable of being sued, and that Graham was not entitled to immunity. Appellants asserted that Graham "owed Peterson a duty as the primary breacher," and that Graham had "failed to look and see if anyone was in the detonation area" before detonating the charge. (Appellants' Memo Contra to GPD and Graham's Mot. for Summ. Jgmt. at 22.)

{¶ 21} On November 29, 2016, GPD and Graham filed a motion for a status conference noting that dispositive motions had been pending in the action since 2013.

{¶ 22} On December 14, 2016, the trial court issued a decision and entry granting appellees' motions for summary judgment. The court concluded that, because "detonating explosives [is] a dangerous activity" and Peterson "was aware of the risk of injury" from a blast, "primary assumption of risk completely bar[red] any negligence claim." (Decision at 4.) The court further held that neither Martyn nor Graham had acted recklessly.

{¶ 23} Appellants appeal, assigning the following errors for our review:

> [I.] The Trial Court committed reversible error when it misapplied the Primary Assumption of the Risk Doctrine to the facts and circumstances of this case and granted Summary Judgment to Defendant[s]-Appellees.

> [II.] The Trial Court committed reversible error by granting Summary Judgment when it found that Appellee Randy Martyn did not engage in reckless conduct.

> [III.] The Trial Court committed reversible error by granting Summary Judgment when it found that Appellee James Graham did not engage in reckless conduct.

> [IV.] The Trial Court committed reversible error when the trial court found that Appellee Gahanna Police Department and Appellee James Graham were immune from liability.

{¶ 24} Appellate review of summary judgment motions is de novo. *Helton v. Scioto Cty. Bd. of Commrs.*, 123 Ohio App.3d 158, 162 (4th Dist.1997). "When reviewing a trial court's ruling on summary judgment, the court of appeals conducts an independent review of the record and stands in the shoes of the trial court." *Mergenthal v. Star Banc Corp.*, 122 Ohio App.3d 100, 103 (12th Dist.1997). We must affirm the trial court's judgment if any of the grounds raised by the movant at the trial court are found to support it, even if the trial court failed to consider those grounds. *Coventry Twp. v. Ecker*, 101 Ohio App.3d 38, 41-42 (9th Dist.1995).

{¶ 25} Summary judgment is proper only when the party moving for summary judgment demonstrates that: (1) no genuine issue of material fact exists, (2) the moving party is entitled to judgment as a matter of law, and (3) reasonable minds could come to but one conclusion and that conclusion is adverse to the party against whom the motion for

summary judgment is made, that party being entitled to have the evidence most strongly construed in that party's favor. Civ.R. 56(C); *State ex rel. Grady v. State Emp. Relations Bd.*, 78 Ohio St.3d 181, 183 (1997).

{¶ 26} When seeking summary judgment on grounds that the non-moving party cannot prove its case, the moving party bears the initial burden of informing the trial court of the basis for the motion and identifying those portions of the record that demonstrate the absence of a genuine issue of material fact on an essential element of the non-moving party's claims. *Dresher v. Burt*, 75 Ohio St.3d 280, 293 (1996). The moving party does not discharge this initial burden under Civ.R. 56 by simply making a conclusory allegation that the non-moving party has no evidence to prove its case. *Id.* Rather, the moving party must affirmatively demonstrate by affidavit or other evidence allowed by Civ.R. 56(C) that the non-moving party has no evidence to support its claims. *Id.* If the moving party meets its burden, then the non-moving party has a reciprocal burden to set forth specific facts showing that there is a genuine issue for trial. Civ.R. 56(E); *Dresher* at 293. If the non-moving party does not so respond, summary judgment, if appropriate, shall be entered against the non-moving party. *Id.*

{¶ 27} Appellants' first assignment of error asserts the trial court erred by applying primary assumption of risk to the facts of the case. Appellants contend that implied assumption of risk, rather than primary assumption of risk, applies herein.

{¶ 28} To establish actionable negligence, one must show the existence of a duty, a breach of the duty, and an injury resulting proximately therefrom. *Menifee v. Ohio Welding Prods. Inc.*, 15 Ohio St.3d 75, 77 (1984); *Strother v. Hutchinson*, 67 Ohio St.2d 282, 285 (1981). A defendant's duty to a plaintiff depends upon the relationship between the parties and the foreseeability of injury to someone in the plaintiff's position. *Simmers v. Bentley Constr. Co.*, 64 Ohio St.3d 642, 645 (1992). If a reasonably prudent person would have anticipated that an injury was likely to result from a particular act, the court could find that the duty element of negligence is satisfied. *Texler v. D.O. Summers Cleaners & Shirt Laundry Co.*, 81 Ohio St.3d 677, 680 (1998).

{¶ 29} "Ohio law recognizes three categories of assumption of the risk as defenses to a negligence claim: express, primary, and implied or secondary." *Schnetz v. Ohio Dept. of Rehab. & Corr.*, 195 Ohio App.3d 207, 2011-Ohio-3927, ¶ 21 (10th Dist.), citing *Crace*

*v. Kent State Univ.*, 185 Ohio App.3d 534, 2009-Ohio-6898, ¶ 10 (10th Dist.). Express assumption of a risk occurs when parties to a contract agree to a release of liability. *Ballinger v. Leaniz Roofing, Ltd.*, 10th Dist. No. 07AP-696, 2008-Ohio-1421, ¶ 7.

{¶ 30} "Under the doctrine of primary assumption of the risk, a plaintiff who voluntarily engages in a recreational activity or sporting event assumes the inherent risks of that activity and cannot recover for injuries sustained in engaging in the activity unless the defendant acted recklessly or intentionally in causing the injuries." *Morgan v. Ohio Conference of the United Church of Christ*, 10th Dist. No. 11AP-405, 2012-Ohio-453, ¶ 13, citing *Crace* at ¶ 13, citing *Santho v. Boy Scouts of Am.*, 168 Ohio App.3d 27, 2006-Ohio-3656, ¶ 12 (10th Dist.). "The rationale behind the doctrine is that certain risks are so intrinsic in some activities that the risk of injury is unavoidable." *Id.* Thus, by participating in the activity, the plaintiff "tacitly consent[s]" to the risk of injury inherent in the activity. *Collier v. Northland Swim Club*, 35 Ohio App.3d 35, 37 (10th Dist.1987). The doctrine applies to both spectators and participants alike. *Gentry v. Craycraft*, 101 Ohio St.3d 141, 2004-Ohio-379, ¶ 10. *See Cincinnati Base Ball Club Co. v. Eno*, 112 Ohio St. 175, 180-81 (1925) (explaining that, as it is "common knowledge that in baseball games hard balls are thrown and batted with great swiftness, that they are liable to be thrown or batted outside the lines of the diamond, and that spectators in positions which may be reached by such balls assume the risk thereof").

{¶ 31} "[A] successful primary assumption of risk defense means that the duty element of negligence is not established as a matter of law." *Gallagher v. Cleveland Browns Football Co.*, 74 Ohio St.3d 427, 431-32 (1996). The defense thus prevents a plaintiff from making a prima facie negligence case, and is perhaps "more appropriately called the no-duty rule." *Wolfe v. Bison Baseball, Inc.*, 10th Dist. No. 09AP-905, 2010-Ohio-1390, ¶ 18. Whether to apply the defense of primary assumption of the risk presents an issue of law for the court to determine. *Crace* at ¶ 12, citing *Gallagher* at 435.

{¶ 32} To succeed on a primary assumption of risk defense, it must be shown that (1) the danger is ordinary to the activity, (2) it is common knowledge that the danger exists, and (3) the injury occurs as a result of the danger during the course of the activity. *Santho* at ¶ 12. *See also Gentry* at ¶ 10, citing *Thompson v. McNeill*, 53 Ohio St.3d 102, 104 (1990).

{¶ 33} To determine the ordinary or inherent risks of an activity, a court must "focus[] exclusively upon the activity itself." *Schnetz* at ¶ 28. "The types of risks associated with the activity are those that are foreseeable and customary risks of the activity." *Foggin v. Fire Protection Specialists, Inc.*, 10th Dist. No. 12AP-1078, 2013-Ohio-5541, ¶ 9. Thus, "primary assumption of risk requires an examination of the activity itself and not plaintiff's conduct. If the activity is one that is inherently dangerous and from which the risks cannot be eliminated, then a finding of primary assumption of risk is appropriate." *Gehri v. Capital Racing Club, Inc.*, 10th Dist. No. 96APE10-1307 (June 12, 1997). *See also Gallagher* at 432 (noting that "only those risks directly associated with the activity in question are within the scope of primary assumption of risk"); *Crace* at ¶ 16 (noting that the injured plaintiff's "subjective consent to and appreciation for the inherent risks are immaterial to the [primary assumption of risk] analysis").

{¶ 34} For example, in *Ochall v. McNamer*, 10th Dist. No. 15AP-772, 2016-Ohio-8493, this court held that the inherent risks of go-karting included "running into other go-karts on the track, or deviating from the track and running into any object present around the track." *Id.* at ¶ 49. As such, the plaintiff in *Ochall* primarily assumed the risk of injury "when she stood 10 to 12 feet away from the [appellees'] go-kart track while a go-kart race was in process." *Id.* at ¶ 50. *See also Morgan* at ¶ 17 (holding that primary assumption of risk barred the plaintiff's negligence action, as hiking involved "the risk of tripping, slipping and falling," and the plaintiff was injured when he fell while hiking); *Thompson* at 106 (holding that, as "[s]hanking the ball is a foreseeable and not uncommon occurrence in the game of golf," the plaintiff primarily assumed the risk of being hit by a golf ball by playing the game of golf); *Brumage v. Green*, 2d Dist. No. 2014-CA-7, 2014-Ohio-2552, ¶ 14; *Blankenship v. CRT Tree*, 8th Dist. No. 80907, 2002-Ohio-5354, ¶ 44.

{¶ 35} Primary assumption of risk has been applied to activities which are not typically considered recreational activities, when the risk of injury is inherent to the activity and cannot be eliminated. *See Foggin* at ¶ 13 (holding that primary assumption of risk applied to the activity of climbing a ladder); *Cave v. Burt*, 4th Dist. No. 03CA2730, 2004-Ohio-3442, ¶ 19 (holding that primary assumption of risk applied to "[r]iding on a car's trunk lid," because "the risks associated with it cannot be eliminated"); *Miljkovic v.*

*Greater Cleveland Regional Transit Auth.*, 8th Dist. No. 77214 (Oct. 12, 2000) (applying primary assumption of risk when the plaintiff "voluntarily chose to cross the railroad tracks as a matter of convenience"); *Wagner v. Kretz*, 3d Dist. No. 1-17-24, 2017-Ohio-8517, ¶ 20 (applying primary assumption of risk to the activity riding on a parade float).

{¶ 36} The remaining category of assumption of risk, implied assumption of risk, is defined as the "plaintiff's consent to or acquiescence in an appreciated, known or obvious risk to plaintiff's safety." *Collier* at 37. "Implied assumption of the risk does not relieve defendant of his duty to plaintiff." *Id.* at paragraph two of the syllabus. Thus, implied assumption of risk "exists when a plaintiff, who fully understands the risk of harm to himself, nevertheless voluntarily chooses to subject himself to it, under circumstances that manifest his willingness to accept the risk." *Cappelli v. Youngstown Area Community Action Council*, 7th Dist. No. 05 MA 175, 2006-Ohio-4952, ¶ 16.

{¶ 37} Implied assumption of risk has been merged into Ohio's comparative negligence statute, R.C. 2315.33. *Anderson v. Ceccardi*, 6 Ohio St.3d 110 (1983), paragraph one of the syllabus. *See also Cave* at ¶ 17 (noting that it is "because the plaintiff knew of the danger involved and acquiesced to it" that the plaintiff's "claim may be barred under comparative negligence principles"). Pursuant to the comparative negligence statute, the trier of fact must apportion relative degrees of fault between the plaintiff and the defendant in deciding the issue of negligence. *Collier* at 39. Thus, implied assumption of risk "ordinarily involves questions of fact that generally are to be decided by the fact finder." *Durnell v. Raymond Corp.*, 10th Dist. No. 98AP-1577 (Nov. 16, 1999).

{¶ 38} The distinction between primary and implied assumption of risk rests on the risk at issue in the case. "[O]nly those risks directly associated with the activity in question are within the scope of primary assumption of risk, so that no jury question would arise when an injury resulting from such a direct risk is at issue." *Gallagher* at 432, citing *Eno*. However, when a case presents "attendant circumstances that raise questions of fact whether an injured party assumed the risk in a particular situation," the doctrine of "implied assumption of risk, not primary assumption of risk, would be applicable." *Id.*

{¶ 39} For example, in *Aber v. Zurz*, 175 Ohio App.3d 385, 2008-Ohio-778 (9th Dist.), the court observed that although "falling off a tube and sustaining facial injuries [was] a foreseeable risk of tubing at a typical, reasonable, speed," the "specific facts" of the

case demonstrated that the "risk was elevated by the speed of the boat and other conditions solely under [the defendant's] control." *Id.* at ¶ 14. In *Aber*, the defendant admitted he was driving the boat " 'too fast for the conditions that day,' " and other boat passengers testified that "they had never seen [defendant] go as fast as he did" on the day of the plaintiff's injury. *Id.* at ¶ 13. The court found primary assumption of risk inapplicable, as the injury occurred "after falling off the tube at a *high rate of speed*," and the plaintiff "could not have foreseen this elevated risk." (Emphasis sic.) *Id.* at ¶ 14.

{¶ 40} In *Byer v. Lucas*, 7th Dist. No. 08-NO-351, 2009-Ohio-1022, the plaintiff was injured while participating in a hayride. The court observed that, although the "inherent risks of a hayride might include getting scratched by tree branches, being bounced around on the wagon, and even losing one's balance and falling off the wagon," the specific risks which resulted in the plaintiff's injury were "risks that extended well beyond the ordinary" risks "associated with a hayride." *Id.* at ¶ 30. The evidence demonstrated that the driver "chose to take the hayride down * * * a steep hill," resulting in the "tractor and its wagon cascading down a steep hill out of control and jackknifing to a stop throwing passengers from it." *Id.* at ¶ 30, 39. As these were not "inherent risk[s] of a hayride," the court concluded that primary assumption of risk did not apply to the facts of the case. *Id.* at ¶ 39.

{¶ 41} The activity at issue in the present case is an explosive breaching training seminar involving students from OSHP and GPD, with Martyn as the course instructor. Under the first element of a primary assumption of risk analysis, we must determine whether the danger or risk at issue was ordinary to the activity. *Santho* at ¶ 12.

{¶ 42} The present activity did not involve individuals detonating explosives at random with no set procedure. To the contrary, this was a class for law enforcement personnel to learn how to properly and effectively detonate explosives in order to breach a structure. OSHP used a particular shot sequence to signal when a detonation was to occur. GPD used a different shot sequence to signal when a detonation was to occur. Although this fact is in dispute, Martyn testified he instructed the class participants regarding the particular shot sequence they were to utilize during his class. Accordingly, the evidence demonstrates that, at an explosive breaching training, a shot sequence precedes the

detonation of the explosive and signals to the primary breacher when to detonate the charge.

{¶ 43} Explosive breaching training carries certain inherent risks, including the risk of being struck by fragmentation from an explosive. Even when all participants utilize the same shot sequence, accidents can occur and injury from an explosion may result. However, the present case presents an issue of fact regarding attendant circumstances which would elevate the risks at issue beyond the ordinary risks of an explosive breaching training. Viewing the evidence in a light most favorable to Peterson, Martyn never instructed the August 2008 course participants regarding the shot sequence they were to utilize during his class. The likelihood of injury from an explosion at an explosive breaching training is greatly increased beyond the general, ordinary risk of an injury from an explosion when class participants utilize different shot sequences because they were not instructed as to a cohesive shot sequence.

{¶ 44} The risk that explosive breaching training class participants would utilize different shot sequences because they were not instructed regarding the shot sequence they were to use during the class would not be an ordinary risk of an explosive breaching training. Therefore, there is an issue of fact to be resolved by the trial court to determine whether primary assumption of risk would be applicable in this case.

{¶ 45} Accordingly, the trial court erred in granting appellees' motions for summary judgment on the basis of primary assumption of risk. The record presents genuine issues of material fact regarding whether Martyn instructed the August 2008 class participants, prior to Peterson's injury, as to the shot sequence they were to utilize during his class. On remand, if the trier of fact concludes Martyn did not instruct the class as to the shot sequence, the court should analyze the case under the doctrine of implied assumption of risk which is subsumed under Ohio's comparative negligence scheme. *See* R.C. 2315.33.

{¶ 46} Based on the foregoing, appellants' first assignment of error is sustained. The trial court's award of summary judgment is reversed, and the case is remanded for proceedings consistent with this decision. Our ruling on the first assignment of error renders the second and third assignments of error, regarding Martyn's and Graham's recklessness, moot. *See Thomas v. Strba*, 9th Dist. No. 12CA0080-M, 2013-Ohio-3869, ¶ 19; App.R. 12(A)(1)(c).

{¶ 47} Appellants' fourth assignment of error asserts the trial court erred in finding GPD and Graham were immune from liability. In moving for summary judgment, GPD argued that it was not an entity or political subdivision capable of being sued. Graham argued that he was immune from appellants' negligence claims pursuant to R.C. 2744.03(A)(6).

{¶ 48} As relevant herein, R.C. 2744.03(A)(6) provides a political subdivision employee with immunity unless one of the following apply: (a) the employees acts or omissions were manifestly outside the scope of the employee's employment or official responsibilities, or (b) the employee's acts or omissions were with malicious purpose, in bad faith, or in a wanton or reckless manner. R.C. 2744.03(A)(6)(a) and (b). In their motion for summary judgment, GPD and Graham asserted that the only "relevant exception to immunity in the case at bar, [was] whether Graham's acts or omissions were done in a wanton or reckless manner," which they argued were not. (Appellees' Mot. for Summ. Jgmt. at 10.) GPD and Graham noted that Peterson had alleged in his complaint that Graham was acting within the scope of his employment at the time of Peterson's injury, but GPD and Graham did not further discuss the issue. (*See* Appellees' Mot. for Summ. Jgmt. at 12.) GPD and Graham never addressed the fact that Graham was on vacation during the August 2008 seminar in their motion for summary judgment.

{¶ 49} In appellants' memorandum contra GPD and Graham's motion for summary judgment, appellants argued GPD was capable of being sued, and that the R.C. 2744.03(A)(6)(a) exception to immunity applied as Graham was on vacation during the August 2008 seminar. Appellants noted that Graham's deposition testimony demonstrated he "took vacation time from the GPD in order to attend this training," and argued that "[b]y being on vacation, Graham [could not] be said to be acting within his employment or official responsibilities." (Appellants' Memo Contra to GPD and Graham's Mot. for Summ. Jgmt. at 18.) Indeed, Graham testified he used his "own personal vacation" time to attend the seminar, as his "patrol lieutenant said that [he] wasn't authorized to take - - to be paid on duty for it." (Graham Depo. at 41.) Appellants noted that GPD and Graham's motion for summary judgment did "not provide any analysis under [R.C. 2744.03] subsection (a) for this Court's consideration, and relie[d] solely on Plaintiffs' Complaint." (Appellants' Memo Contra to GPD and Graham's Mot. for Summ. Jgmt. at 19.) Appellants pointed out that

Graham's deposition had not yet taken place at the time they drafted their complaint, and that it was "Graham's own deposition testimony that ha[d] placed him outside the scope of his employment." (Appellants' Memo Contra to GPD and Graham's Mot. for Summ. Jgmt. at 19.)

{¶ 50} In granting GPD and Graham's motion for summary judgment, the trial court stated that "[e]ven if suit was brought against the proper governmental entity, for all of the reasons set forth in the Gahanna Defendants' Motion, the Court agrees that Defendant [Graham] is entitled to immunity and there is no vicarious liability." (Decision at 8.) Thus, the court concluded that Graham was entitled to immunity based solely on the arguments set forth in GPD and Graham's motion for summary judgment.

{¶ 51} "It is well-established that questions not considered by a trial court will not be ruled upon by [the appellate] court." *Ochsmann v. Great Am. Ins. Co.*, 10th Dist. No. 02AP-1265, 2003-Ohio-4679, ¶ 21, citing *Mills-Jennings, Inc. v. Dept. of Liquor Control*, 70 Ohio St.2d 95, 99 (1982) (refusing to consider on appeal issues raised in the party's motion for summary judgment which the trial court had not addressed). "While it is true that an appellate court reviews a trial court's summary judgment decision de novo, [an appellate court must] not consider issues raised in summary judgment proceedings that the trial court failed to rule on." *Tree of Life Church, FWC v. Agnew*, 7th Dist. No. 12 BE 42, 2014-Ohio-878, ¶ 27, citing *Conny Farms, Ltd. v. Ball Resources, Inc.*, 7th Dist. No. 09 CO 36, 2011-Ohio-5472, ¶ 15. *See Murphy v. Reynoldsburg*, 65 Ohio St.3d 356, 360 (1992) (holding that "even though" an appellate court reviewing an award of summary judgment "must conduct its own examination of the record," if the "trial court does not consider all the evidence before it, an appellate court does not sit as a reviewing court, but, in effect, becomes a trial court," and accordingly the failure of the "trial court to thoroughly examine all appropriate materials filed by the parties before ruling on a motion for summary judgment * * * constitutes reversible error"); *Yoskey v. Eric Petroleum Corp.*, 7th Dist. No. 13 CO 42, 2014-Ohio-3790, ¶ 40, citing *Murphy* at 360 (noting that "de novo review still entails a *review* of what the trial court decided") (Emphasis sic.); *State ex rel. Deem v. Village of Pomeroy*, 4th Dist. No. 17CA3, 2018-Ohio-1120, ¶ 42 (holding that, as the trial court never addressed the defendants' summary judgment argument that Spaun was

entitled to "immunity under R.C. 2744.03(A)(6)," the appellate court "decline[d] to do so for the first time on appeal").

{¶ 52} In granting GPD and Graham's motion for summary judgment, the trial court never ruled on GPD's argument that it was not capable of being sued. Although the court stated that Graham was entitled to immunity for the reasons contained in GPD and Graham's motion for summary judgment, that motion never addressed the fact Graham was on vacation while attending the seminar. In their memorandum contra, appellants presented the court with Graham's deposition testimony demonstrating he was on vacation during the training. Yet, the trial court did not review or consider this evidence before granting GPD and Graham's motion. Accordingly, as the trial court failed to rule on these issues, they are not properly before us at this time.

{¶ 53} Having sustained appellants' first assignment of error, rendering appellants' second and third assignments of error moot, and having declined to address appellants' fourth assignment of error, we reverse the judgment of the Franklin County Court of Common Pleas, and remand the case to that court for further proceedings consistent with law and this decision.

*Judgment reversed and cause remanded.*

KLATT, J., concurs.
SADLER, J., dissents.

SADLER, J., dissenting.

{¶ 54} Because I believe explosive breaching training is an inherently dangerous activity and would not focus on the actions of the defendant in determining this issue, I disagree with the majority opinion that the first assignment of error should be sustained. As a result, I respectfully dissent.

{¶ 55} As provided in the majority opinion, under the doctrine of primary assumption of risk, a plaintiff who voluntarily engages in an activity assumes the inherent risks of that activity and cannot recover for injuries sustained in the activity unless the defendant acted recklessly or intentionally in causing the injuries. *Ochall v. McNamer*, 10th Dist. No. 15AP-772, 2016-Ohio-8493; *Morgan v. Ohio Conference of the United Church of Christ*, 10th Dist. No. 11AP-405, 2012-Ohio-453, ¶ 13.

{¶ 56} Under the first assignment error, the majority opinion focuses on the actions of a defendant (Martyn's alleged failure to instruct the class on the shot sequence) to conclude that the defendant elevated the risk beyond the inherent risks of explosive breaching training. As a result, the majority opinion holds that the trial court erred in granting summary judgment on the basis of determining explosive breaching training is an inherently dangerous activity. In other words, the majority opinion uses the defendant's actions to define the risks inherent in the activity.

{¶ 57} In my view, in determining whether explosive breaching training is an inherently dangerous activity, the activity itself is the focus, reserving the defendant's actions as a next-step issue of whether the defendant was reckless. *See, e.g., Ochall* at ¶ 44-47, 52, 62, 79, 105, fn. 2 (finding that "in analyzing the risks inherent to [the activity], we must focus exclusively on the activity * * *, and not on the actions or omissions of the defendants in this case" and that the actions of the defendant—whether they "enhanced" the risk—"would be appropriately addressed when considering whether the exception of recklessness or willfull or wanton conduct applies to application of primary assumption of the risk"); *Foggin v. Fire Protection Specialists, Inc.*, 10th Dist. No. 12AP-1078, 2013-Ohio-5541, ¶ 10 ("The defendant's conduct is relevant only if it rises to reckless or intentional conduct."); *Morgan v. Kent State Univ.*, 10th Dist. No. 15AP-685, 2016-Ohio-3303, ¶ 21-23 (declining to address, in its determination of whether primary assumption of risk applied to a karate class, the plaintiff-appellant's contentions regarding the karate instructor's actions and instead finding this argument to be essentially "a claim that the instructor was reckless" that had not been pled); *Morgan*, 2012-Ohio-453, ¶ 16-26 (finding, in its determination of whether primary assumption of risk applied to night-hiking, appellant's argument that risks which led to the injury could have been eliminated if the hike leader had chosen a different trail "is essentially a claim that [hike leader's] conduct was reckless," which had not been pled); *Crace v. Kent State Univ.*, 185 Ohio App.3d 534, 2009-Ohio-6898 (10th Dist.) (determining that trial court did not err in applying the primary assumption of risk defense to an injury plaintiff incurred while practicing a cheerleading stunt and then analyzing, as a separate consideration, whether the cheerleading instructor acted recklessly or intentionally to nonetheless permit recovery).

{¶ 58} When focused on the activity itself rather than the conduct of the defendant, common sense directs explosive breaching training is an inherently dangerous activity. *See Foggin* at ¶ 9 (inherent risks "associated with the activity are those that are foreseeable and customary risks of the activity"); *Collova v. Matousek*, 85 Ohio App.3d 440, 447 (8th Dist.1993) (citing *Taylor v. Cincinnati*, 143 Ohio St. 426 (1944), for the proposition that in an absolute nuisance case, "handling of explosives; the explosion of an unguarded, unexploded bomb in a public park and several instances of blasting operations" are inherently dangerous). I would find the danger of an injury due to an errant explosion during field training as occurred in this case to be the foreseeable and "customary" risk of explosive breaching training. *Foggin* at ¶ 9. While this risk may be reduced through procedures and precautions, I do not believe the risks of explosive breaching training could ever be "completely eliminated." *Crace* at ¶ 42.

{¶ 59} Therefore, I would find that explosive breaching training is a type of inherently dangerous activity that is subject to the doctrine of primary assumption of risk. As a result, I would overrule appellants' first assignment of error and proceed to the remaining assignments of error to consider whether summary judgment is appropriate on the issue of allegedly reckless conduct by Martyn and/or Graham, which would negate the primary assumption of risk doctrine, and any resulting consequence on the fourth assignment of error.[1] *Ochall* at ¶ 34. Because the majority opinion does otherwise, I respectfully dissent.

———————————————

[1] I note that if the third assignment of error addressing Graham's alleged reckless conduct is overruled, I believe the fourth assignment of error would be rendered moot by application of the primary assumption of risk doctrine.